STATE OF MAINE

*vs.*

EMILE JOSEPH TURMEL

Aroostook.   Opinion, May 8, 1952.

*Ralph W. Farris,*
*James P. Archibald,* for State.

*Nathan H. Solman,*
*Asa H. Roach,*
*Robert L. Krechevsky* of Conn. Bar, for Defendant.

SITTING:   MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

THAXTER, J.   The respondent was indicted for the murder committed on September 2, 1949 of Anna Evelyn Dun-

lap at Houlton in the County of Aroostook. On his representation that he would plead not guilty by reason of insanity, he was on September 21, 1949 ordered committed to the Augusta State Hospital for observation. The report from that institution was received at the November term of the Superior Court for Aroostook County at which term he was arraigned, pleaded not guilty and went to trial. Nothing more was heard of the defense of insanity. He was convicted of murder, sentenced to the State Prison for life, filed a motion for a new trial, which was denied by the trial justice, and filed an appeal which is now before us.

The evidence shows that the respondent, twenty-seven years old, a resident of Hartford, Connecticut, was employed as a laborer in the construction of the Houlton High School. On the afternoon of Friday, September 2, 1949, he finished his work on that job and shortly thereafter was seen with Anna Dunlap at the head of the stairs which led to her apartment over the liquor store on Bangor Street in Houlton. Apparently then or shortly thereafter Turmel went into Anna Dunlap's apartment with her and he was not seen in the hallway with her again. Subsequently about eight thirty p. m. Anna Dunlap's voice was heard coming from her apartment using the word "Stop." Three times this was heard and each time it was accompanied by a slap.

Subsequently, on Saturday morning September 3rd, at ten o'clock, her badly mutilated, naked body was found on the bed in the bedroom of her apartment by her sister, Mrs. Phyllis Giberson, and her sister-in-law, Mrs. Mae Dunlap, and her brother, Charles Dunlap. The doors entering the apartment were all locked and it was necessary for Charles Dunlap to break open one of the doors to enter. The bedroom was in great confusion; a leg had been broken off one of the chairs which was in the room; blood was splattered over the walls, and the mattress on the bed; and the bed clothes were soaked with blood. According to the respondent's story, as he told it on the witness stand, he had been

to Anna Dunlap's apartment, had had some drinks with her and another man there; the other man finally went out leaving him and Anna Dunlap together; then for an agreed sum of two dollars which he paid her he had intercourse with her, both of them having previously undressed; afterwards according to his story, he found two men going through his clothes; he accused her of being implicated in rolling him; a fight followed with her during which she kicked him, in the course of which he knocked out one of the men. It is unnecessary to go further into the sordid details of what he said took place; but he coolly dressed himself; combed his hair; and went out on the street leaving her moaning and bleeding on the bed to die. According to Dr. Gagnon who performed the autopsy, death apparently came from suffocation from a hemorrhage into her fractured trachea and larynx. He hitch hiked to Limestone to make a date with another girl living there whose name had been given him by a fellow convict at the Houlton jail whom he met while he was serving time there on an intoxication charge. The respondent tried to cross the international boundary line at St. Leonard but was refused admission to Canada by the immigration officer on duty there. He was subsequently picked up near Van Buren by state trooper, Labree, shortly after noon on September 3rd, and in cooperation with state troopers, Bernard and Carmichael, was placed under arrest and taken back to the county jail at Houlton. Here he was examined in the presence of the county attorney, the sheriff, and other prosecuting officers. He was sober and talked freely and willingly. All his rights were carefully safeguarded and no inducement of any kind was held out to him to talk, nor was he threatened in any way.

The respondent, in addition to having admitted the killing of the deceased, made such admission in such language and in such manner that there can be but little doubt that he was one whose mind was devoid of those ordinary instincts of humanity which restrain and govern most men in their

dealings with their fellows. Anna Dunlap was perhaps not entitled to much; but she was entitled to life. And her deliberate and atrocious killing, and the unparalleled brutality of it as told by the respondent, was an offense against us all. We are unable to find in this gruesome record one palliating feature.

The respondent, after having been fully warned of his rights, told at the jail substantially the same story which he has told on the witness stand, "that he hit her three or four times, or five or six times, with the side of his hand, first, near the Adam's apple or here in the neck, and hit her in the face with his fist and she fell to the floor; he picked her up and put her on the bed; she was bleeding by the nose or eyes or mouth, he didn't seem to know which, and she was moaning when he left the room; he went out in the kitchen, washed his hands and face and combed his hair and left the room by the bedroom door; he went down on the street, taking his gear with him, and went over towards North Street and thumbed a ride north to Caribou; on arrival at Caribou he met a boy that he knew, went to a restaurant with him, and from there he got a ride over to Limestone to see a girl friend."

And later on, he said: "If you want to know who done the job, I done it." He said: "I hit her four or five times."

He was anxious to find out if there was first and second degree murder here in Maine and was told by the officers that we had no such distinction, just murder and manslaughter.

Jasper Lycette, the sheriff of the county, testified as follows:

"Q  Now, Sheriff, did he make any statement as to what happened between him and this woman after he had had this fracas with the men?

"A  Yes, he said that when he came back she was standing up somewhere near the bed and as I

recollect he said, 'You dirty so-and-so,' and he said he struck her, he said 'like that with the heel of my hand on the throat and on the back of her neck and then I gave her several hard blows with my closed fist in her face."

Police Chief, Magaw, of Houlton, testified that the respondent said: "this woman was standing somewhere near the bed, I believe, and he said he let her have it right then and knocked her down, then he picked her up and threw her on the bed and hit her again."

Turmel himself took the stand and told the whole gruesome, brutal story of how Anna Dunlap died. His version of what happened at the Houlton jail corresponds with the officers' stories.

"A  Well, I wouldn't say they tried to drive anything out of me. I was willing to tell them."

After telling how he hit her, we find the following:

"Q  And she was moaning?

A  She was moaning when I left the apartment and she was on the bed.

Q  How bad was she bleeding?

A  Oh, she was bleeding because I saw the blood dripping off her face.

Q  Where did it come from?

A  I can't recall whether it was coming from her nose or her ears."

Then in cross examination, we find the following:

"Q  Did it take the fight out of her when you hit her across the throat?

A  Not exactly the fight out of her.

Q  What did she do?

A  She took hold of my two hands and she was holding me close and in the meantime pain went through me and I broke loose and when

I broke loose I hit her with all my might with my fist.

Q   You say you hit her with all your might, just as hard as you could? A.   Well, I hit her. I was mad.

Q   And those blows you struck knocked her down on the floor by the bed? A.   That is right.

Q   * * * When you left the room she was lying on the bed, blood coming out of her face and she was moaning, and you didn't care what happened to her?

A   Well, I left. I know that.

Q   And you went out the back door?

A   I know it wasn't a nice thing to do."

We quote this testimony not merely to relate the details of this gruesome murder but to address ourselves to the one narrow issue before us. The respondent claims that the verdict should have been manslaughter not murder. The jury was correctly charged by the trial judge, and should have had in their minds the distinction between these two forms of homicide. This is either one or the other. There is no claim that this act was done in self defense; nor is there any other legal justification put forth for it.

Murder under our law is the unlawful killing of a human being "with malice aforethought, either express or implied." Rev. Stat. 1944, Ch. 117, Sec. 1. Malice aforethought does not necessarily mean that there must be specific intent to kill but our court has laid down the rule in the case of *State* v. *Knight,* 43 Me. 11, 137, as follows: "But in all cases where the unlawful killing is proved, and there is nothing in the circumstances of the case as proved, to explain, qualify or palliate the act, the law presumes it to have been done maliciously; and if the accused would reduce the crime below the degree of murder, the burden is upon him to rebut the inference of malice, which the law raises from the act of

killing, by evidence in defence." And Chief Justice Shaw, in *Commonwealth* v. *Webster*, 5 Cush. 295, 322, lays down the ancient rule as taken from East's Pleas of the Crown as follows: "but he who wilfully and deliberately does any act, which apparently endangers another's life and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him of malice prepense." Manslaughter is the unlawful killing of a human being without malice aforethought, express or implied. Rev. Stat. 1944, Ch. 117, Sec. 8. Such killing may take place in various forms. It may be done in the heat of passion or on sudden provocation, or it may even be accidental.

Where, as here, excessive force and brutality is used, it would seem to be very difficult for the respondent to produce any circumstances which would reduce the crime from murder to manslaughter. We have read the record over with the greatest care and there is not a single palliating circumstance therein. The jury was fully justified in their verdict of murder. The jury, to use the language of the court in *Commonwealth* v. *Fox*, 7 Gray, 585, 588, were fully justified in believing that this murder "proceeded from an evil disposition or a mind and heart regardless of social duty and fatally bent on mischief."

On the subject of implied malice and in substantiation of the statement that malice may be presumed from the killing, even when not done with a lethal weapon, there is an instructive note to the case of *Commonwealth* v. *Buzard*, reported in 22 A.L.R. (2d) 846 (Pa. 1950).

Counsel for the respondent argues that there was an abuse of discretion by the trial justice in admitting in evidence a photograph of the dead body of the deceased; that such photograph was too gruesome and could not but have prejudiced the jury against the respondent. Although exceptions to its admission were noted, they were not perfected. Were they now before us they could not be sus-

tained. The photograph was properly taken; it had relevancy in determining the atrociousness of the crime; it was no more gruesome than the testimony related by the respondent on the stand; in any event its admissibility was within the discretion of the trial justice. *State* v. *Turner,* 126 Me. 376; *State* v. *Stuart,* 132 Me. 107, 108.

The rights of the respondent were carefully protected both before and at all times during the trial. The judge was meticulous in seeing that he was given every safeguard which the law allowed him. The verdict could not have been otherwise.

*Appeal dismissed.*

*Motion for new trial denied.*

*Judgment for the State.*