STATE OF MAINE
*vs.*
JOHN ERNST

Kennebec.   Opinion, April 8, 1955.

*Joseph Campbell,* for State.

*Dubord & Dubord,* for respondent.

SITTING: WILLIAMSON, TIRRELL, WEBBER, TAPLEY, JJ.
FELLOWS, C. J., and BELIVEAU, J., did not sit.

TAPLEY, J.   On exceptions and appeal.   The respondent
was tried for the crime of murder, before a jury, at the Oc-
tober Term, 1953 of the Superior Court, within and for the
County of Kennebec and State of Maine.   The jury returned
a verdict of manslaughter.   The respondent was sentenced to
a term of not less than two years and not more than four
years in the Maine State Prison.

John Ernst, the respondent, is a chicken farmer living in
Sidney, Maine and operating two chicken farms located on
the West side of the Middle Road in Sidney and identified
as the Upper Farm and the Lower Farm.   He lives on the
Lower Farm.   These farms are approximately a mile apart.
His principal business is the production and sale of eggs.
He employs an average of fourteen persons, among whom
was one Alfred Snow, the victim.

About 10:45 P. M. of the evening of August 14, 1953, the
respondent, then at his home, was called upon by his fore-
man, Gerald H. Campbell, who notified him that he had just
seen an automobile, which he identified as belonging to
Snow, parked on the Middle Road approximately 350 feet
North of the driveway leading to the Upper Farm.   He told
Ernst he thought that someone "might be making off with
chickens."   The respondent armed himself with his shotgun
and proceeded to where the Snow car was parked on the
Middle Road.   Campbell followed in his automobile.   The
respondent parked his car directly in front of the Snow car
and Campbell parked his car to the rear of the Snow car and
then they proceeded to search for Snow by investigating the
brooder houses and egg house located on the Upper Farm.
They then walked to the Middle Road where the cars were
parked, after finding no evidence of larceny, whereupon
their attention was attracted by two men hurrying along

the highway carrying a case of eggs between them. Upon being discovered they dropped the eggs and ran into the woods. One of the men was Alfred Snow, the victim, and the other named Roger Owens, his companion. Ernst ordered Campbell to go to the farmhouse, notify the State Police and upon his return to bring with him Ernst's shotgun which he had left propped against an automobile standing in the yard of the farmhouse. When Campbell came back from the farmhouse with Ernst's gun, Ernst took possession of the gun and fired it twice into the woods in the general direction taken by Snow and Owens, whereupon Owens emerged from the woods and approached Ernst who was then standing in a clearing near the road and when he reached a point in close proximity to Ernst, the respondent struck him in the stomach with the muzzle of the gun. Soon after the appearance of Owens, Snow came from the woods and, as he left the wooded area, Ernst went into a clearing after Snow and escorted him to a position near the parked cars on the road, Ernst being behind Snow directing the gun at him as they were walking. When they reached a point on the road near the car of Ernst, the gun was fired, resulting in the death of Snow.

During the trial of the case, respondent took exceptions to the exclusion of testimony; to the admission of testimony; to the admission of exhibits in the form of photographs; to the refusal of the presiding justice to give requested instructions to the jury; and to certain portions of the charge of the presiding justice. The respondent also appealed from the denial of a motion for a new trial. The respondent's bill of exceptions contains a total of thirty-two exceptions and of this number the following designated exceptions are expressly waived: numbers 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 21, 24, 25, 26 and 28.

In the interests of clarity, the exceptions will be considered in numerical sequence.

## EXCEPTION 3.

Exception 3 concerns a question asked of Frederick Kneeland, a State Police Officer, on cross-examination by defendant's counsel and relating to Roger Owens. The question reads as follows:

> "Q. How many other cases do you know of where a man has admitted committing a felony and he is charged with a misdemeanor and allowed to go on probation?"

The question was excluded.

This question had nothing whatever to do with the issues in the case or the status of Roger Owens as a witness for the State, and by its exclusion the respondent could not have been aggrieved.

Exception 3 overruled.

## EXCEPTION 4.

Frederick Kneeland testified that Roger Owens was charged with the larceny of a case of eggs; that upon his plea of guilty he was sentenced to sixty days in the County Jail; that sentence was suspended and he was placed upon probation for one year conditioned that he go to Togus for a checkup. On cross-examination, Officer Kneeland was asked this question, referring to Owens and the condition of probation:

> "Q. Is it because this man needs psychiatric treatments?"

The record discloses that Officer Kneeland knew nothing about the reasons why Owens was placed on probation conditioned that he go to Togus and it is apparent that any answer to the question could not have been within the knowledge of the officer. His testimony in respect to the dis-

position of Owens' case was personal knowledge of disposition only and nothing more.

Respondent takes nothing by this exception.

### EXCEPTIONS 14, 16, 17, 18, 19 AND 20.

These exceptions relate to the admissions of photographs displaying the body of the victim, showing a gunshot wound and other wounds about the left side, the forehead and right arm of the deceased. The pictures also depicted the condition of the body during various stages of the autopsy. The record shows testimony relating to various wounds and abrasions on the body that were depictured in the photographs and concerning each photographic exhibit there was testimony referring to these wounds and abrasions alleged to have been caused by the actions of the respondent. The photographs were extremely gruesome primarily because of the fact that they were taken during autopsy procedure. It is signficant to note that the gunshot wound and other wounds, contusions and abrasions were plainly visible and not interfered with by autopsy incisions. The law is well settled that the mere fact that a photograph is gruesome is not a reason for its non admission. *State* v. *Stuart,* 132 Me. 107.

The presiding justice has great latitude and discretion in determining the admissibility of photographs and unless there is shown an abuse of discretion, his ruling will not be disturbed on exceptions.

*State* v. *Jordan,* 126 Me. 115, at page 116:

> "Our court has granted to trial judges a very wide latitude in receiving or refusing this kind of evidence. Whether or not photographs may be admitted as evidence is a question addressed to the discretion of the trial judge. Whether any given photograph appears to be fairly representative of the object portrayed and whether or not it may

be useful to the jury are preliminary questions addressed to his discretion, and, except for abuse of that discretion, no exception lies. ****** The admissibility of a photograph does not depend on its verification by the photographer, provided it is shown to be an accurate representation by any one competent to speak from personal observation. The sufficiency of the verification is a preliminary question of fact for decision by the trial judge. ****"

*State* v. *Turmel,* 148 Me. 1, at page 7.

*State* v. *Rainey,* 149 Me. 92, at page 94.

See 159 A. L. R., page 1413, *et seq.*

See Wigmore on Evidence, Vol. IV, Sec. 1157.

There was no abuse of discretion in admitting the photographs.

Exceptions 14, 16, 17, 18, 19 and 20 overruled.

### EXCEPTION 22.

Arthur Freeman was a captain in the Maine State Police and performed the particular functions of Supervisor of the State Police Bureau of Identification. There was no objection to his qualifications. During the course of his testimony he was questioned about a certain test or experiment he made on the gun that was used in the shooting. The purpose of this test was to determine whether or not there was any mechanical failure in the operation of the gun. Counsel for the respondent objected in the following language:

"Without describing any test I object to any evidence about the test in the absence of showing there is any similarity in the conditions under which tests were made and any evidence in the case relating to the account, itself."

The testimony of the witness Freeman was that the gun was dropped from a distance of about thirty inches onto the floor by the butt and then thrown on its side several times at a distance of thirty inches to ascertain if it would explode, and that the trigger pull was tested to ascertain the required pull in poundage to release the hammer. There was also some evidence of test firing the gun. In view of the position taken by the respondent, that the deceased grabbed the gun and started to pull it out of the respondent's hand and that the respondent had nothing to do with causing the gun to be fired, it becomes relevant under these circumstances for the State to determine, by test and experiment, exactly what the condition of the gun was insofar as its firing capacity was concerned.

26 Am. Jur., pages 466-467.

*Mansfield* v. *Commonwealth*, 174 S. W., page 16 (Ky.)

This exception is overruled.

### EXCEPTION 23.

Norman Hamilton, a sergeant of the Maine State Police, witnessing for the State, was asked on cross-examination the following question:

> "Q. One more question. Do you know whether or not, Sergeant Hamilton, on August 14, 1953 Alfred Snow was on parole from Maine State Prison?"

Counsel for the State objected to the question and counsel for the respondent, in the absence of the jury, made the following offer of proof:

> "MR. DUBORD: We are offering it, Your Honor, for the reason that there have been two State witnesses testify, one was Roger Owens who testified that as the respondent, Ernst, was bringing Snow up through the woods he

said, 'Don't shoot. I will pay for the eggs.' Another State witness who testified was Mr. Campbell, who testified that the remark Snow made was 'Don't have me locked up. I will pay for the eggs.' It is our position that the fact, if we are able to establish it, and I think we can, that Alfred Snow was on parole from Maine State Prison and it would have been more likely for him to have made the remark that Mr. Campbell testified to than the remark that Mr. Owens testified to."

Counsel for the respondent contends that an answer to the question should have been allowed because if it was shown that Snow was on parole from Maine State Prison he would be more likely to have said, "Don't have me locked up. I will pay for the eggs" instead of "Don't shoot. I will pay for the eggs." thus, to some degree, authenticating Campbell's testimony rather than that of Owens'. The respondent, Ernst, testified that Snow said, "Don't have me arrested. I will pay for the eggs."

We have here a situation where the testimony of the respondent and that of Campbell corroborated each other, where from the testimony of the respondent himself, Snow is pleading that Ernst shall not have him arrested and also from the testimony of Mr. Campbell, a State witness, a quoted remark of Snow's, "Don't have me locked up."

The testimony of Roger Owens in this particular does not exactly coincide with that of Ernst and Campbell. Owens testified that Snow said, "Don't shoot me and I will pay for the eggs."

We fail to see, in light of the evidence, where refusal to permit the question to be answered was prejudicial to the respondent.

*Gross* v. *Martin,* 128 Me. 445, at page 446:

"A party excepting to the exclusion of evidence always has the burden of showing affirmatively that the exclusion was prejudicial to him."

Exception 23 overruled.

## EXCEPTION 27.

Joyce Campbell was a witness testifying in behalf of the defense. A portion of her testimony concerned her activity in telephoning the State Police from the home of Mr. Smalley who resided a short distance from the scene of the homicide. She testified in substance that her husband took her to the Smalley residence in his car; that she alighted from the car and proceeded to gain entrance to the Smalley home for the purpose of using the phone. She had some difficulty in gaining entrance. She evidenced some fear that she might be prevented in doing so by Owens and Snow whom she thought might be in the vicinity. On cross-examination she testified that while waiting to get inside the house she was nearly crying and when asked why she was so distraught and ready to cry, she answered:

"Because I was out alone and the thought that was coming to me was that they might be circling around and they might be armed."

and that they might prevent her from using the telephone.

Later in the trial, State Trooper Paul S. Blethen, a State's witness, took the stand in rebuttal. Officer Blethen was a dispatcher on duty at State Police Headquarters on the night of the homicide. He had previously testified that he had received a telephone call from Joyce Campbell reporting the homicide. Blethen was asked in rebuttal the question:

"Q. Will you describe for the jury what her tone was and her manner of speech?"

This question was objected to by defense counsel. The question was allowed to stand over the objection and the answer was:

"A. Very calm, cool, and collected."

The State's purpose in propounding the question was to show that by the tone of her voice over the telephone there was no indication that she was emotionally upset as she had previously testified.

The allowance of the question under the circumstances was proper and the exception must be overruled.

### EXCEPTION 29.

This exception pertains to the refusal of the presiding justice to give instructions requested by the respondent. The requested instructions in this exception are numbered 1, 3, 6, 7, 9, 12, 15, 16, 17, 18, 19, 21, 22, 23 and 24. The substance of the requested instructions are set out as follows:

1. Definitions of murder, malice and implied malice.
3, 6. Burden of proof and reasonable doubt.
7. Circumstantial evidence.
9. Justifiable homicide.
12. Instructions to disregard gruesome character of photographs.
15, 16, 17, 18, 19, 21, 22, 23. Homicide resulting from accident or misadventure.
24. False testimony as to any material matter.

In considering these requested instructions, the court does so with the accepted and well established rule of law in mind so aptly and thoroughly expressed by Justice Worster in *State* v. *Cox*, 138 Me. 151, at page 169:

"A presiding justice is not bound to repeat what has been substantially and properly covered in his

charge to the jury, nor is he bound to adopt the particular language used in the requested instruction, if the jury had otherwise been properly instructed in accordance with law."

*(Requested Instructions 1, 3, 6, 7, 9.)*

. A review of the charge as given shows that requested instructions 1, 3 and 6 were adequately covered; that requested instruction 7 is unnecessary of consideration because there was no circumstantial evidence in the case requiring instruction on that point; that number 9 was properly given.

*(Requested Instruction 12.)*

. The presiding justice in his discretion properly admitted the photographs. The respondent contends that the justice below committed error in not giving instruction 12, which, in effect, is an admonition to the jury that it is not to permit the gruesome character of the photographs to inflame the minds of the jurors against the defendant. The gruesomeness of the pictures was caused by the autopsy procedure, which is apparent on the face of the photographs. They further show that the type of gruesomeness complained of could not have been caused by the acts of the defendant.

The respondent has not shown that he was aggrieved by the refusal to give this instruction nor can it be said that he was prejudiced by its exclusion.

*(Requested Instructions 15, 16, 17, 18, 19, 21, 22, 23.)*

These instructions concern basically a killing by accident although some of them contain a request for instruction on homicide by misadventure. It is to be remembered that one element of defense was that the deceased in grabbing and pulling the gun, then in the hands of the respondent, caused it to fire, projecting the bullet into the body of the deceased, causing his death.

The respondent in "Requested Instruction No. 15," speaks particularly of homicide by misadventure or accident, and says, in part:

> "***** it is necessary that the act resulting in death must have been a lawful one; that the killing was accidental and without unlawful intent or evil design; and that the person responsible for the death was not guilty of a high degree of carelessness."

The respondent met Snow in a small clearing a short distance from the road and there took him into custody at the point of a gun. They then proceeded to the road where respondent's car was parked, during which time Snow was in front with the respondent behind covering him with the gun and, according to the respondent's testimony, he pushed him with the gun twice. Respondent escorted Snow to a point in front of respondent's automobile and, desiring to turn on the lights of his car, the respondent passed Snow as he was standing there and, while passing, he claims that Snow grabbed the gun and started to pull it out of his hand, at which time the gun exploded. There is no evidence in the case that Snow, the deceased, attempted flight or became hostile to detention at any time after custody was taken of him by the respondent. The respondent cannot complain if we take his version of the action between himself and the deceased at the time of the fatal shooting. According to his own story, the arrest of Snow had been completed. In respect to the apprehension of Snow by Ernst, the record shows that Ernst testified on cross-examination as follows:

"Q. Had he surrendered? Had he come out?
A. He would not come up on the road.

Q. He had come out?
A. He had come out.

Q. He was coming in your direction?
A. Yes.

Q. Did he ever make any attempt to run after that?

A. No.

Q. Did he ever make any attempt to get away?

A. No."

The fact, as he says, that he was leaving the immediate presence of the deceased to turn on the lights of his automobile would indicate no thought in his mind that Snow would attempt flight or otherwise relieve himself of restraint.

Therefore, under the circumstances, homicide by misadventure does not apply.

Respecting accidental killing, the presiding justice expressed himself in the following language:

"Counsel for the respondent has called my attention to what on my part was not an intentional omission, that being the claim made by the defense that this was an accidental killing for which the respondent was not responsible. It is for you to say whether it was accidental killing. When they were up there at the car and the respondent had the gun in his hands, pressed against the body of the man who is now dead, and he turned and grabbed, if you believe he grabbed, was it accidental killing? Was it an accident? Was it something for which the deceased person was solely responsible, or was it because of the situation he had been placed into by this respondent? They claim accidental killing and if you find, of course, from the evidence, that the shooting was accidental, of course this respondent is not guilty."

It is to be noted that there is absent from this portion of the charge such expressions as "that the act resulting in death must be a lawful one, without unlawful intent or evil design." The fact that the presiding justice did not include these rules of law pertaining to misadventure is something

of which the respondent should not complain as it was to his advantage. The jury was merely told:

> "They claim accidental killing, and if you find, of course, from the evidence, that the shooting was accidental, of course this respondent is not guilty."

In these words the respondent received all that he was entitled to, according to the evidence, and certainly was not prejudiced by such a clear and concise utterance. *State* v. *Kurz*, 37 A. (2nd) 808, at page 811 (Conn.) ; *Commonwealth* v. *Knox*, 105 A. 634 at page 636 (Pa.)

In reference to accidental killing, see *State* v. *Benham* (Iowa) 92 Am. Dec. 417; 26 Am. Jur. "Homicide" Secs. 204, 212, 220.

*(Requested Instruction 24.)*

The instruction, as requested, is in the following language:

> "The Court instructs the jury that, if the jury believe that any witness testified falsely on any material matter, that in such case the jury is at liberty to disregard entirely the testimony given by that witness."

Counsel for the respondent points out that this instruction is submitted "in view of the apparent wilful and material discrepancies in the testimony of various State witnesses, especially as relates to the Municipal Court testimony and the Superior Court testimony."

The record does not reveal any testimony of State witnesses which raises anything other than factual questions for jury determination. There is no element of that quality of intentional falsity in the testimony that requires favorable consideration of the instruction. It appears from the cases bearing on the point that it is better practice that the giving of this type of instruction should be left to the discretion of the court.

*State* v. *Abbott,* 245 S. W. (2nd) 876, at page 881 (Mo.):

"Where there is a factual basis in the testimony of the witnesses for the giving of such an instruction, this court has always held that it was discretionary with the trial court to give or to refuse to give an instruction of this character."

*State* v. *Kolylasz,* 47 N. W. (2nd) 167 (Iowa).

90 A. L. R. 74; 23 C. J. S. Criminal Law, Sec. 1259.

Exception 29 overruled.

## EXCEPTION 30.

The presiding justice charged the jury concerning felony murder. This portion of the charge was predicated on that part of the case having to do with the arrest of Snow by the respondent. The State's contention was that if the respondent exceeded his authority in the arrest and apprehension of the deceased by using undue force amounting to an assault and battery and that the deceased died as a result of the unlawful action and that action amounted to a felony, then the respondent would be guilty of murder.

The respondent contends that the instruction was inadequate and that the doctrine of felony murder did not apply.

The instruction given by the court concerns murder as a result of the commission of a felony. The verdict was manslaughter. The respondent cannot properly complain in this instance as the verdict was for a lesser offense than that concerned in the charge of felony murder. Even if we assume, which we do not, that the charge in this respect was prejudicial error, it was cured by verdict. *State v. Carabajal,* 193 P. 406 (N. M.)—17 A. L. R. 1098-1103.

There was nothing in this charge on felony murder, in light of the evidence, calculated to influence the jury to return a verdict of manslaughter.

Respondent was not prejudiced.

Exception 30 overruled.

### EXCEPTION 31.

The court instructed as to the right of a property owner to eject trespassers. The instruction explained the law pertaining to the legal right of the respondent to eject from his premises one who is trespassing thereon. Counsel for the respondent agrees with the law as given but contends that this instruction was immaterial and not required by the evidence or by any claim of the respondent and that the giving of the instruction tended to mislead the jury.

The evidence shows that although the deceased had entered upon the respondent's property for the purpose of stealing eggs, that act had been completed and the actions of the respondent which terminated in the death of Snow had nothing to do with the ejectment of Snow as a trespasser.

The question to be determined is whether the giving of this instruction was prejudicial to the rights of the respondent.

The record is so replete with evidence showing in detail all of the action which involved the respondent and the victim Snow culminating in the death of Snow and taking place outside the bounds of respondent's property, that it is proper to say that the giving of this instruction could not have, in any way, prejudiced the minds of the jury to the extent that it rendered a verdict of manslaughter.

*People* v. *Soules,* 106 P. (2nd) 639, at page 646 (Cal.) :

"A multitude of authorities hold that even though inapplicable instructions are given to the jury regarding a subject upon which there is no evidence, it does not constitute reversible error unless it ap-

pears that the defendant was actually prejudiced thereby."

24 C. J. S., page 1017, Section 1922 C:

"The giving of instructions, whether correct or not, which are abstract or are not authorized by the pleadings and evidence, will not constitute a ground for reversal where, under the circumstances, no prejudice results to accused; and the presumption is that an instruction having no application to the case made by the pleadings and proof does not injure accused. \*\*\*\*\*\*".

Respondent takes nothing by this exception.

### EXCEPTION 32.

In that portion of the charge concerning accidental killing, the presiding justice said:

"When they were up there at the car and the respondent had the gun in his hands, pressed against the body of the man who is now dead, and he turned and grabbed, if you believe he grabbed, was it accidental killing?"

Respondent contends in this exception that there was no evidence supporting that portion of the instruction concerning the pressing of the gun against the body of Snow and argues that this statement is prejudicial to the rights of the respondent.

Respondent should have made his complaint before the jury retired.

*Smart* v. *White*, 73 Me. 332, at page 339:

"It is contended that the judge misstated to the jury some of the testimony of the defendant. Were it so, the objection comes too late after verdict. The judge's attention should have been called to the matter before the jury retired, so that he could correct himself, if he had fallen into error."

*State* v. *Wilkinson,* 76 Me. 317; *Grows* v. *Maine Central Railroad Company,* 69 Me. 412.

Exception 32 overruled.

### APPEAL.

The respondent appealed from the denial by the justice below of a motion for a new trial. He contends that the motion should have been granted and in support of his contention argues that the only way the verdict of manslaughter could have been returned by the jury on the evidence was by disregarding the testimony and the drawing of inferences not warranted by the evidence. In further contention, he says that the verdict is against the law because of the improper, unfair and inadequate charge of the presiding justice. He further states that the court in his charge assumed facts not proved and gave undue prominence to the State's theories.

We have disposed of respondent's complaints as to errors in law, which leaves for consideration only the question as to whether or not the verdict was against the evidence.

John Ernst was charged with the crime of murder. On the night of the homicide the respondent went to the Upper Farm, armed with a shotgun, in search of a person or persons whom he had reason to believe were committing burglary on his property. After investigation he left his premises and went some distance to the main highway where his car was parked. There he learned two men had dropped a case of eggs, which they were carrying between them, and ran into the woods. These men were Snow, the victim, and his companion, Owens. It was then he requested Mr. Campbell to procure the gun for him which he had left propped against the car in the yard of Mr. Smalley. The gun was brought to him and he proceeded to use it in connection with the apprehension of both Owens and Snow. The first man to be apprehended was Owens who came out of the

woods, after the respondent had fired a shot or two in that direction, and gave himself into the custody of the respondent. There was testimony that Owens suffered some physical abuse by Ernst when he was using the gun to prod Owens along. Soon after the apprehension of Owens, Snow came out of the woods and was met by the respondent in a clearing a short distance from the road and there he was taken into custody at the point of a gun. There is some evidence that there was the use of the gun as a prodding medium against Snow. The testimony discloses different versions as to what actually took place at the time of the firing of the gun. The respondent, by arming himself with a loaded shotgun, assumed a responsibility to the extent that if he used the gun, he must do so under circumstances legally proper. The jury might well have found from all of the evidence that the respondent was in an angry mood and that death came to Snow by the acts of the respondent under circumstances justifying a verdict of manslaughter as defined by the court. There is much factual evidence in this case upon which to sustain a jury verdict of guilty of manslaughter.

*State* v. *Smith, et al.,* 140 Me. 44, at page 47:

"The single question before this Court on appeal 'is whether in view of all the testimony, the jury were warranted in believing beyond a reasonable doubt, and therefore in declaring by their verdict,' that the respondents were guilty as charged."

*State* v. *Priest,* 117 Me. 223; *State* v. *Morin,* 149 Me. 279.

We cannot say that the jury was not warranted in believing beyond a reasonable doubt that the respondent was guilty of manslaughter.

> *Exceptions overruled.*
> *Appeal dismissed.*
> *Motion for new trial denied.*
> *Judgment for the State.*