STATE OF MAINE
*vs.*
ELIE JOSEPH ARSENAULT

Androscoggin.    Opinion, August 1, 1956.

122

*Gaston M. Dumais,*
*William D. Hathaway,* for State.

*Israel Alpren,*
*Philip Isaacson,* for respondent.

SITTING: FELLOWS, C. J., WILLIAMSON, WEBBER, BELIVEAU, TAPLEY, JJ. MURRAY, A.R.J. CLARKE, J., did not sit.

FELLOWS, C. J.   This is an indictment for murder on which Elie Joseph Arsenault was tried at the November term, 1954, of the Androscoggin County Superior Court. The verdict was guilty.  The case now comes to the Law Court on respondent's exceptions to portions of the charge by the Presiding Justice as given, and on exceptions for refusal to charge as requested.

In the case at Bar, there is a motion to the Law Court for new trial, which was not directed to or passed upon by the Presiding Justice, and not now before the Law Court. *State v. Bobb,* 138 Me. 242, R. S. 1954, Chapter 148, Section 30. The motion was not argued by counsel.

The principal facts contained in nearly four hundred pages of record are briefly these:  Elie Joseph Arsenault, otherwise known as Joseph Elie Arsenault, a taxi driver in Auburn, Maine, in the early fall of 1952 first met the deceased, Harriet Hinckley, who had been a nurse, and who was then a widow with a small amount of money left to her by her husband.  Mrs. Hinckley moved into the apartment

next to that occupied by Arsenault and his wife. While Mrs. Arsenault was away working, the neighbor acquaintance of Joe Arsenault and Harriet Hinckley grew steadily into an intimate friendship, because they were both deeply interested in alcohol. The respondent became messenger and agent for Mrs. Hinckley in the withdrawal of her money to buy liquor. They had long drinking bouts together, with intimate relations.

The respondent testified that on Tuesday, June 29, he, the respondent, received a telephone call from the deceased summoning him over. She wanted to do some drinking, and then visit a daughter in Brunswick. He called for her and they traveled to Auburn where he purchased two pints of whiskey. These were consumed on the road between Auburn and Brunswick, and at the daughter's home. While in Brunswick, pints three and four were purchased. Pint three they drank in Brunswick.

The respondent further testified that late Tuesday evening, the pair left Brunswick. Prior to leaving, Mrs. Hinckley asked her daughter for her revolver, because she had a chance to sell it. She placed the gun in her purse. Pint four was disposed of in Durham, and they fell asleep in the parked automobile. On arising Wednesday, June 30, 1954, they returned to Lewiston and bought pints five and six. These were transported back to Durham where they were consumed. They then returned to Auburn, and pint seven was purchased. This was drunk in Auburn at the home of a friend during the afternoon. A messenger was employed to obtain pint eight, and this was likewise disposed of.

The respondent said that in the evening they left the friend's home and obtained pint nine. At one point on the trip there was an altercation between Mrs. Hinckley and the respondent, and "she slapped me." What the quarrel was about does not appear. Joe said he "was in a fog," and did not remember if she was intoxicated or not, nor who

was driving the car. Joe had a gun of his own, and Mrs. Hinckley had a gun of her own. They returned to the Durham road and remained until after dark. The bottle was finished, and the home where Mrs. Hinckley had been employed as a nurse became the destination, as the owners were away. Pints ten and eleven had been hidden there. In a bedroom of the home, the couple drank these, and the respondent said he commenced to "pass out." Mrs. Hinckley then produced some barbiturates, two of which the respondent swallowed. These pills, he said, made his condition worse. He sat down on the edge of a bed. She was lying next to him. He said she had the gun. She was familiar with guns. He testified that he remembers nothing more.

The respondent testified that when he awoke on Friday morning, Mrs. Hinckley lay dead of a bullet wound. He said he acquired some additional whiskey and recalls almost nothing of the next two days. On Friday afternoon, the police arrived at the death room, at the telephone call of the respondent himself. They found the body of the deceased covered with flowers and religious insignia.

The evidence of the State was to the effect that the respondent telephoned the police, and when the police arrived, Arsenault admitted the shooting of Mrs. Hinckley because he "loved her." One officer said "that woman is dead," and respondent Arsenault replied, "Why shouldn't she be? I shot her." The respondent also told the officers that she asked him to take the gun and to shoot her. In substance, the respondent also told the officers the story as told by him when in court at the trial. The State showed that Mrs. Hinckley's son-in-law took a gun away from the respondent some weeks before the shooting, because the respondent was in the yard at Brunswick pointing the gun at Mrs. Hinckley, threatening to shoot her. Mrs. Hinckley at that time, in the presence of her daughter, son-in-law, and the respondent, at the daughter's house, told her son-in-law "to

put the gun away so that he will not shoot." Mrs. Hinckley and the respondent then were on "a drinking bout." Mrs. Hinckley got the gun back from her daughter just before the day of the shooting by telling the daughter that "she and Joe had a chance to sell it."

From the State's case a jury would be authorized in finding beyond a reasonable doubt that Harriet Hinckley died as the result of a bullet wound. The respondent admitted that he fired the shot, and his testimony is corroborated by evidence that the fatal bullet in the body of Harriet Hinckley was fired from a revolver, which revolver was in the possession of the respondent at the time he was arrested. The procuring of the gun and the use of it indicate premeditation. In addition to this, there are many facts sufficient to imply malice. The evidence nowhere indicates that this implication is in any manner rebutted.

It is sufficient in every indictment for murder to charge that the defendant did feloniously, willfully, and with malice aforethought kill and murder a human being. R. S. 1954, Chapter 145, Section 11.

Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder. R. S. 1954, Chapter 130, Section 1.

Manslaughter is the unlawful killing of a human being without malice aforethought, express or implied. Manslaughter may be in the heat of passion or on sudden provocation, or it may even be accidental. R. S. 1954, Chapter 130, Section 8; R. S. 1954, Chapter 22, Section 151; *State* v. *Pond,* 125 Me. 453; *State* v. *Turmel,* 148 Me. 1, 7.

Where there are statutory degrees of murder (as formerly in Maine) intoxication may sometimes reduce from first to second degree murder. Intoxication will not reduce to manslaughter where there is malice aforethought, and where there is no provocation or sudden passion. Voluntary

intoxication is no excuse for murder. "Voluntary intoxication is not an excuse, or justification, or extenuation of a crime." *Com.* v. *Hawkins,* 3 Gray (Mass.) 463, 466; *Commonwealth* v. *Malone,* 114 Mass. 295. See 26 Am. Jur. 233, Sec. 116, "Homicide" and cases cited; 40 C. J. S. 830, Sec. 5, "Homicide" and the cases there cited.

When the fact of killing is proved and nothing further is shown, the presumption of law is that it is malicious and an act of murder. *State* v. *Knight,* 43 Me. 11; *State* v. *Neal,* 37 Me. 468; *State* v. *Turmel,* 148 Me. 1; *Commonwealth* v. *York,* 9 Metc. (Mass.) 93; *Commonwealth* v. *Webster,* 5 Cushing (Mass.) 295.

"Malice," as used in the definition of murder, does not necessary imply ill will or hatred. It is a wrongful act, known to be such, and intentionally done without just and lawful cause or excuse. *State* v. *Merry,* 136 Me. 243, 8 Atl. (2nd) 143; *State* v. *Knight,* 43 Me. 11; *State* v. *Robbins,* 66 Me. 324.

Voluntary intoxication is not an excuse for crime, *except in those cases where knowledge or specific intent are necessary elements.* "Intoxication does not make innocent an otherwise criminal act." *State* v. *Siddall,* 125 Me. 463, 464.

As the court say in *State* v. *Quigley,* 135 Me. 435, 443, "It is still held by an overwhelming weight of judicial authority that when the insanity of the accused is pleaded in defense, ability to distinguish between right and wrong is the test. *State* v. *Knight,* 95 Me. 467. In the case at bar, insanity is not the plea. When it is attempted to prove the presence of insanity, madness, in early cases termed phrenzy, a test uniformly applied is to determine whether or not the one charged with doing a criminal act possessed, at the time of the act capacity to know the difference between right and wrong."

The following charge has been held proper where the indictment was for an intent to kill: "If it appears from the evidence that the prisoner was intoxicated at the time, and if you find that his state of intoxication was such that he had so far lost his intelligence, and his reason and faculties, that you have a reasonable doubt whether he was able to form and have a purpose to kill, or to know what he was doing, then you should find him not guilty of *intent to kill.*" (Emphasis ours.) *State* v. *Quigley,* 135 Me. 435, 443.

The criterion for determining whether or not a jury verdict in a criminal case should be set aside and a new trial ordered is: In view of all the testimony, was the jury warranted in believing beyond a reasonable doubt that the respondent was guilty? *State* v. *DiPietrantonio,* 119 Me. 18, 19; *State* v. *Pond,* 125 Me. 454; *State* v. *Albanes,* 109 Me. 199; *State* v. *Lambert,* 97 Me. 51; *State* v. *Priest,* 117 Me. 223.

Originally there were no degrees of murder in Maine and the crime was punishable by death. See Laws of Maine, 1822, Chapter 2, Section 1. Later the legislature enacted two degrees of murder, the essential difference between the two being that in first degree murder express malice was required; whereas, in second degree murder only implied malice was necessary. First degree murder was punishable by death and second degree murder was punishable by life imprisonment. See R. S. 1841, Chapter 154, Section 1, 2, and 3. In 1887 the death penalty for first degree murder was abolished. See Public Laws, 1887, Chapter 133, Section 2. As a result of this change in penalty, both first and second degree murder were punishable by life imprisonment. Consequently, there was no longer any need for distinguishing between the two degrees of murder; and in 1903, degrees of murder were abolished, and the definition of murder which now appears in the Statutes was adopted. See

R. S. 1903, Chapter 119, Section 1; R. S. 1954, Chapter 130, Section 1.

The exceptions taken by the respondent relate to some portions of the Charge as made, and to the failure to give certain requested instructions. The jury was charged that intoxication is not an excuse for crime, and exceptions were taken. The presiding Justice also refused to Charge, on request, that if the respondent had, through intoxication, so far lost his intelligence, reason and faculties that he no longer knew what he was doing, that he could not be guilty of murder.

Two of the requested instructions were as follows: The respondent requested the court to charge the jury that: "If it appears from the preponderance of the evidence that the respondent was intoxicated at the time of the killing, and if you find that his state of intoxication was such that he had so far lost his intelligence and his reason and faculties that you have reasonable doubt whether he was able to form and have a purpose to kill or to know what he was doing, then you should find him not guilty of the charge of murder." The court refused to charge as requested, and the respondent duly excepted, which exception was allowed.

The respondent also requested the court to charge the jury as follows: "If you find that the respondent by the preponderance of the evidence has shown that at the time the crime was committed, had so far lost his intelligence and reason as to be temporarily insane, even though induced through the voluntary consumption of alcohol, then you should find him not guilty of the crime of murder." The court refused to charge as quoted, and the respondent duly excepted to the ruling, which exception was allowed. The jury returned a verdict of guilty.

The respondent argues in his brief: "If he was so intoxicated as to be unable to produce either of the two intentional

components of murder, i. e., the intent to do the act in murder based on implied malice, or intent to kill in murder based on express malice, he is not guilty of murder." The respondent in his brief further says: "By stating that intoxication is not an excuse for crime and limiting the consideration of intoxication to memory at the time of an alleged confession and to the ability to do the act, the presiding Justice became the victim of the fallacy. Drunkenness is not an excuse if it produces an intent to kill, but it can explain an act. Even more important, however, is the criminal state of mind. The act, which admittedly may be explained, must be connected with a criminal state of mind." And the respondent also contends that "if any person is insane at the time of the commission of an act constituting a crime, and if there is a proximate relationship between the insanity and the act, then the law supplies that person with an excuse. The fact that the insanity is the product of voluntary intoxication is not a bar to the application of this doctrine."

The respondent, in other words, claims that a person temporarily and voluntarily so intoxicated that for the time he is apparently insane should be subject to rules governing a trial where the plea is "not guilty by reason of insanity." The respondent would also have the insanity rule changed, so that the right and wrong test would not apply, because he criticizes the rule in *McNaghten's Case,* 10 Clark and Finnelly 200, 8 Eng. Rep. 718, followed in *State* v. *Lawrence,* 57 Me. 574; *State* v. *Knight,* 95 Me. 467; that under the rule to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, *from disease of the mind,* as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong. The respondent says that this well established rule is not a rule in accord with modern psychological

studies, because the respondent says that "it is only with the acceptance of alcoholism as an illness that we can hope to clarify this area. If the alcoholism brings on an insane state, we are faced with a sad truth; yet we should not assign blame. We must regard the emotions and not over-emphasize the cognitive."

There is no evidence in this case of an "insane state" as claimed by the respondent. There was no "delirium tremens." The respondent's mind was not diseased. There is no claim nor evidence of a diseased mind. The only evidence in the case indicates voluntary intoxication. The testimony of the respondent is but a sordid story of two ordinary individuals vainly seeking mental and physical enjoyment or oblivion through excessive drinking.

We cannot agree with the plausible and able, though unconvincing, arguments advanced by the respondent's counsel in their long and carefully prepared brief. It is not only contrary to existing law but to public policy and public safety. Counsel claim that if the jury found that the respondent had "lost his intelligence and reason" at the time of the shooting, through voluntary intoxication, the respondent should be acquitted and allowed to go without day. The statutes require that even when the plea is "not guilty by reason of insanity," and the respondent is acquitted for that reason, that he automatically be confined in a State hospital for the insane. R. S. 1954, Chapter 27, Sections 118-119. The respondent in the case at bar would not be confined for hospital treatment. He was not insane. The respondent's self-called "insanity" was only drunkenness.

The court is unanimous in its opinion that the rule regarding the defense of insanity should never be extended to apply to voluntary intoxication in a murder case. It would not only open wide the door to defenses built on frauds and perjuries, but would build a broad, easy turnpike for escape. All that the crafty criminal would require

for a well-planned murder, in Maine, would be a revolver in one hand to commit the deed, and a quart of intoxicating liquor in the other with which to build his excusable defense.

We find no error. The respondent was well represented by capable and experienced counsel. All his constitutional rights were fully protected. The Charge was eminently fair, legally correct, and most comprehensive. The jury was warranted under the law and the evidence to find guilt in this case beyond a reasonable doubt. In fact, it is difficult to understand how any result other than a verdict of guilt could be arrived at on the facts testified to by the respondent himself. The entry must be.

*Exceptions overruled.*