**STATE of Maine**

**v.**

**Roy ROLLINS.**

Supreme Judicial Court of Maine.

Oct. 24, 1972.

Peter W. Culley, Asst. Atty. Gen., Augusta, for plaintiff.

Richardson, Hildreth, Tyler & Troubh by William B. Troubh, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

Defendant was charged with having committed an unlawful homicide in manner punishable as murder. After trial by jury defendant was found guilty and adjudicated subject to punishment for murder. Accordingly, he was sentenced to life imprisonment, as mandatorily required by statute. Judgment of conviction was entered and defendant has appealed from the judgment.

At the close of all of the evidence defendant had moved for a judgment of acquittal which was denied. As one ground of appeal defendant maintains that this ruling by the presiding Justice was erroneous. In the face of undisputed eye witness testimony that defendant attacked and killed his victim with a knife at a time when the latter was unarmed, defenseless and so intoxicated as to be nearly comatose, the Justice below properly denied the motion.

The State offered in evidence three colored slides taken during the course of the autopsy performed upon the body of the victim. The defendant offered no objection to the admission of two of these exhibits but did object to the admission of State's Exhibit #5. This picture was narrowly focused upon the fatal

wound and displayed the nearly severed "left common carotid artery" and the hand of the pathologist. The defendant sought to render the use of this slide unnecessary by suggesting that "the defendant does not contest that the neck wound exhibited in Exhibit No. (6) was the terminal wound, and that the effect of that wound was to sever the artery in question which is exhibited in Exhibit No. (5)." In the discharge of its burden to prove guilt beyond a reasonable doubt, the State was not obligated to accept this limited admission as an adequate substitute for the explanatory testimony of its pathologist. The slide having been admitted, it was used effectively by the pathologist in illustrating his oral testimony, particularly with respect to the depth and severity of the puncture. We note also that judgment as to what will inflame the minds of a jury is, in this area at least, purely subjective. Illustrative of that fact is that no objection was offered to the admission of Exhibit #6 showing the dead face of the corpse as well as the fatal wound, whereas Exhibit #5 is a clinical portrayal of the point of entry of the lethal instrument and shows no other portion of the victim's body. Opinions might well differ as to which type of picture would be most likely to arose the emotions of a juror. This is but one of several reasons for adhering to the rule that the use of photographs is best left to the sound discretion of the presiding Justice. Here there was no abuse of that discretion. State v. Duguay (1962) 158 Me. 61, 63, 178 A.2d 129; State v. Turmel (1952) 148 Me. 1, 88 A.2d 367; State v. Ernst (1955) 150 Me. 449, 114 A.2d 369.

Before the presiding Justice instructed the jury the defendant's counsel presented a requested instruction in this form:

"While voluntary intoxication is generally no excuse for murder, if you find that there was no malice aforethought, and find there was sudden passion or provocation in the defendant's actions, then you must consider the question of intoxication as bearing on the defendant's intent, and thus whether he is guilty of manslaughter or murder."

■ The presiding Justice declined to give the jury this instruction. Several factors support the ruling. In the first place there was no evidence in the case from any source, even from the defendant himself who elected to testify in his own behalf, that he was intoxicated. On the contrary, all the witnesses who observed him at the time of the homicide gave it as their opinion that the defendant was not intoxicated.

■ Moreover, and even more importantly, the requested instruction was not an accurate statement of the law of Maine with respect to the crime of felonious homicide. The error of the requested instruction is that it misconceives principles long and firmly established in the law of Maine, which we deem it important for present purposes to recapitulate, and pursuant to which the concept of "malice" (express or implied) functions as a legal formula by which Maine law differentiates ultimate punishment classifications (designated under the labels, "murder" and "manslaughter").

In McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) the Supreme Court of the United States, speaking through Mr. Justice Harlan, produced an enlightening summary of the continuing effort by our jurisprudence, commencing with the earliest days of the common law, satisfactorily to

". . . identify before the fact those characteristics of criminal homicides . . ." (p. 204 of 402 U.S., p. 1466, of 91 S.Ct.)

by which categories of punishment severity might be established.

*McGautha* traces the steps from (1) the mid-fourteenth century "benefit of clergy"

to (2) the "malice" approach, in terms of an actual subjective state of mind (premeditation), as it originated in the sixteenth century, to (3) the further development of the "malice" concept, during the following century and a half, as it became transformed into an objectified criterion under which the act of killing, if in any respect unlawful, would draw the most serious penalty consequences unless further circumstances of extenuation, in the form of "adequate provocation", were made to appear, and finally to (4) the resort, at the end of the eighteenth and the commencement of the nineteenth century, to a specification of "degrees" of felonious homicide.

Although this history was used in *McGautha* to disclose the unsatisfactoriness of the entire effort as it bore upon the problem of marking the felonious homicides "appropriately punishable by death" (p. 198 of 402 U.S., 91 S.Ct. 1454), it is here important because it focuses attention upon another point critical for present purposes. The summary of *McGautha* reveals that the common law dealt with the killing of one human being by another (homicide) with a dominant view that it was far less difficult to delineate the factors rendering homicide criminal or noncriminal than to devise workable, and understandable, classifications (criminality having been formulated) of appropriate penalties.

■ Such common law approach, predicated upon a single underlying criminal entity, "felonious homicide", has been continuingly reflected in the law of Maine. From the inception of Maine's statehood the decisions of this Court have been at pains to reaffirm that—regardless of differences in the wording, or form, of statutes as they might have been revised from time to time to achieve greater conciseness, or coherence, or to adapt to the modified applicability, or total abolition, of the death penalty—the law of this State has sought to preserve the essential principle that the

unlawful killing of one human being by another is, as to its criminality vel non, a single entity within which the concept of "malice" (express or implied) is utilized as a shorthand summarization of factors providing before-the-fact identification of penalty categories ranging from greater to lesser severity. State v. Conley, 39 Me. 78 (1854); State v. Knight, 43 Me. 11 (1857); State v. Turmel, 148 Me. 1, 88 A. 2d 367 (1952); State v. Duguay, 158 Me. 61, 178 A.2d 129 (1962); Brine v. State, Me., 264 A.2d 530 (1970) and all as most recently re-examined and summarized in State v. Wilbur, Me., 278 A.2d 139 (1971).

■ When, therefore, as in the instant case, the contention is that the intentional (and, thus, unlawful) killing is, notwithstanding that it was intentional, "manslaughter" rather than "murder", because it was caused by heat of passion resulting from sudden and adequate provocation, we must keep clearly in mind that attention is being directed to the problem, not of proving the criminality of the homicide since the showing that the killing was intentional fixes its criminality but rather, criminality established, of mitigating the severity of the punishment to be imposed.

In amplification of this point we avoid confusion in analysis and facilitate understanding by bringing to light an underlying ambiguity concealed behind the common law's resort to a single language phrase concerning "malice" and its functioning,— namely, the "presumption of malice."

In one of its primary applications at common law the "presumption of malice" signified a unitary legal principle reflecting two subsidiary aspects: (1) a specification concerning the *proof* of facts relating to features distinguishing homicide as criminal (felonious) or non-criminal (justified or excused)—i. e., that an evidentiary showing (beyond all reasonable doubts) that defendant had killed another human being would be adequate, *in itself and without more,* as the proof to authorize the

fact-finder to conclude (even beyond a reasonable doubt) that the killing had occurred under factual circumstances making it *unlawful* and, thus, a criminal offense (felonious homicide);[1] (2) the statement of a further legal proposition, unrelated to *proof* of facts bearing upon *criminality or non-criminality*, concerned, rather, with the delineation of the public policy considerations material to the scope of the severity of the punishment to be imposed—namely, that defendant's commission of a homicide, *without more and ipso facto,* could validly produce the legal effect that defendant shall be subjected to the most severe punishment recognized by the law (under the label, for purposes of penalty identification, of "murder" as distinguished from "manslaughter").

Early on, there had been sharp and continuing dispute among judges whether the aspect of the "presumption of malice" by which it functioned to provide proof to transform, without more, a homicide into a criminal offense (i. e., felonious homicide) was consistent with other principles independently recognized by the common law that (1) proof of the elements necessary to establish the criminality of conduct must be proof "beyond a reasonable doubt" and (2) proof by circumstantial evidence, to meet the standard of proof beyond a reasonable doubt, must exclude every reasonable hypothesis except that establishing criminality—thereby placing in serious doubt the proposition that the solitary circumstances that defendant had killed another human being could be, *ipso facto,* adequate to exclude as a reasonably hypothesis that the death had been caused under circumstances consistent with lawfulness rather than criminality. See: Commonwealth v. York, 9 Metc. (Mass.) 93 (1845) and the controversy between Shaw, C. J., and Wilde, J., and as further discussed in Commonwealth v. Hawkins, 69 Mass. (3 Gray's Reports) 463, 465, 466 (1885); and see the further references in State v. Knight, 43 Me. 11, 86–87, 137–138 (1857).

Apart from all of the foregoing, however, there remained a second independent and significant foundational function connoted in the common law by the words "presumption of malice"—the legal proposition that once there was evidence validly adequate to authorize a conclusion beyond a reasonable doubt that the circumstances in which defendant had killed another human being rendered the homicide unlawful and thus a crime (felonious homicide), as to the further question of the severity of the punishment to be imposed, the law would treat a homicide, *once* adequately shown to be an *unlawful* killing, as criminal conduct meriting the most severe punishment unless specific factors relevant to the palliation of punishment were adduced.

■ We emphasize that in this aspect it was the import of the "presumption of malice" to deal *not* with any element essential to establish the *criminality* of the homicide . but rather with circumstances bearing upon the severity of the penalty to be imposed—criminality having been already adequately and independently shown to constitute the premise of the further inquiry.

■ In particular, once an *intentional* killing is shown by evidence adequate to serve as proof beyond a reasonable doubt, there is a definitively clear isolation of this separate and distinct legal function linguistically designated as "presuming malice" —a process by which penalty consequences are being attributed to conduct *already and independently* sustainable (by correctly adequate proof beyond a reasonable doubt) as a criminal offense.[2]

---

1. In this probative aspect current learning would identify the principle by use of the word "inference" rather than "presumption." Cf. State v. Poulin, Me., 277 A.2d 493, 498 (1971); State v. Collamore, Me., 287 A.2d 123, 124, 125 (1972).

2. It was precisely to pinpoint this special and restricted aspect of the functioning of the concept of "malice", and of the "presumption" correlatively utilized with it, that this Court in State v. Wilbur, Me., 278 A.2d 139 (1971) (1) repeatedly made

That "malice is presumed" from an intentional killing is thus, basically, only a summarizing characterization of the proposition that the law demands that the intentional killing of one human being by another must bear the heaviest penalty unless extenuated by other circumstances deemed by a wise public policy relevant to the severity of penalty. Furthermore, whether such additional extenuating circumstances have a logical relationship to the fact of the intentional killing, in *probative* terms—i. e., the tendency of the fact of intentional killing to make it more or less probable that the further circumstances exist—is immaterial. The criterion here being utilized is not the adequacy of proof of criminality; it is, rather, a public policy evaluation concerning the nature of punishment in relation to promoting the public safety and welfare.

Thus, the "malice" (said to be "presumed") is not a designation of any subjective state of mind existing *as a fact.* Similarly, the *"presumption"* (of "malice") arising from the fact of an intentional killing is not a designation of any *probative* relationship between the fact of "intention" relating to the killing and *any further facts*—specifically, whether the fact of *intentional* killing negates, more probably than not, the additional facts that the killing was in the heat of passion upon sudden adequate provocation.

In the undertaking to deal with penalty palliation, and as disclosed in State v. Arsenault, 152 Me. 121, 124 A.2d 741

(1956), the traditionally operative principle, reflecting demands of public policy, has been that a person's *choice* to impair his usual behavioral functioning by the consumption of alcohol—(his *voluntary* intoxication)—generally will be denied recognition as a circumstance of palliation for criminal behavior, and, in particular, will be legally irrelevant when *subjective* mental or emotional states are not controllingly dispositive as to the seriousness of penalty.

In the criminal homicide situation the jurisprudence of this State has established that the *subjective* mental, emotional or other behavioral state or condition of the defendant will not be an indispensibly controlling factor in evaluation of the punitive seriousness of the crime. "Heat of passion", concededly a subjective condition, is *by itself,* not controlling upon the question of whether the intentional killing of one human being by another shall be reduced in the severity of the punishment to be imposed. Additionally requisite is the factor that *adequate* provocation must have produced the "heat of passion."

By this concept of the *adequacy* of the provocation the law of Maine has crystallized that, in the ultimo, an objective, rather than a subjective, behavioral criterion measures the severity of punishment.

In State of Maine v. Park, 159 Me. 328, 193 A.2d 1 (1963) this Court explicitly alluded to the generally prevailing principle that, to be "adequate", provocation must be

the observation, throughout the opinion, concisely summarized by the language: ". . . we take the occasion to examine the development of Maine law and the nature and effect of the presumption of malice *which arises once the State has proved beyond a reasonable doubt that the defendant committed a voluntary and intentional homicide, not justifiable or excusable,* . . ." (p. 144) (emphasis supplied) and (2) clarified that, therefore, the actual issue involved ". . . whether or not . . . [there] was . . . provocation . . . in the heat of passion so as to reduce . . . from

murder to manslaughter" (p. 144) was without relation to the facets essential to make homicide unlawful and, therefore, a criminal offense. (See also the reference in Footnote 3, to State v. Millett, Me., 273 A.2d 504 (1971) further clarifying the distinction between issues directed to the *criminality* of the homicide, and the circumstances which make it lawful or unlawful, as distinguished from those which bear upon the nature of penalty—unlawfulness having been adequately established and, therefore, to be assumed as the premise of further evaluation).

". . . of that character which would, *in the mind of a just and reasonable man,* stir resentment to violence, endangering life, . . . ." (pp. 332, 333, 193 A.2d p. 3, quoting from Holmes v. State (Ala.), 88 Ala. 26, 7 So. 193, 194) (emphasis supplied)

It was for this same reason,—that the intentional killing of one human being by another may be placed in a less severe penalty category only on the basis of an *objective* standard of human behavioral responses—that State v. Park denied recognition to any principle of

"partial or limited responsibility, bearing upon the degree of the offense" (159 Me. p. 334, 193 A.2d p. 4)

because it would inject subjective mental or behavioral weaknesses or deficiencies of a particular defendant—a divergence from the objective standard deemed sufficient to outweigh the consideration that the infirmities are suffered involuntarily.

Thus, this Court had previously held in State v. Duguay, 158 Me. 61, 178 A.2d 129 (1962), manifesting its awareness of the operativeness of the objective standard which the Court took occasion to discuss more extensively in *Park,* supra, that one who intentionally kills another human being will gain, for purposes of reducing the penalty severity of an intentional killing from "murder" to "manslaughter",

". . . no aid from the fact that his condition was affected or may have been affected by his voluntary consumption . . . ." (p. 80, 178 A.2d p. 139)

of intoxicating liquor.

The same principle controls the case at bar. The requested instruction sought an incorrect statement of the law of Maine and was properly denied by the presiding Justice.

The entry will be

Appeal denied.

All Justices concurring.

POMEROY, J., did not sit.