STATE of Maine

v.

Henri C. SAMSON, Sr.

Supreme Judicial Court of Maine.

April 4, 1978.

Thomas E. Delahanty, II, Dist. Atty., M. Kelly Matzen (orally), Asst. Dist. Atty., Augusta, for plaintiff.

Holman & Cullenberg by Ronald J. Cullenberg, Farmington, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Active Retired Justice.[1]

'Twas Christmas in 1974; the place, the little hamlet of Chisholm, in the Town of Jay. Henri (the defendant Henri C. Samson, Sr.) was visiting that evening the parents of Mary Ann, a ten year old lassie who had a reading problem. Henri, who had befriended the family and was a frequent visitor at the home, was accompanied on this occasion by Mary Ann's great aunt who was living in with Henri, who had separated from his second wife about a year previously. The two Wright boys, in the age range of Mary Ann and her younger sister, were there with their parents, and the children were playing in the living room, while the adults, the Wrights and Mary Ann's parents, were playing cards in the kitchen. Henri joined the children's play and directed a puppet act, using Mary Ann as one of the performers. The stage props consisted of a couch and blanket, with the blanket serving as a partial cover for Henri and Mary Ann. In addition to his puppet show performance, Henri donned the cap of a teacher in reading to Mary Ann and having her read to him. At all times Mary Ann was seated next to Henri on the couch, both partly covered by the blanket.

Mary Ann had been wearing a nightgown and underpants. She later reported to her mother that, during the games, Henri had put his hand against her private parts. She testified as follows:

"Q. Mary Ann, as you were sitting on the couch there next to Henri, what happened?

"A. He put his hands on my pants.

"Q. Did he put his hands in the front of your pants, or the back?

"A. The front.

"Q. Did he touch you?

"A. Yes.

"Q. Mary Ann, where did he touch you?

"A. Cunt.

"Q. Did he touch you—What did he touch you with?

"A. Hand."

The elder of the Wright brothers corroborated Mary Ann to the extent that he testified she had her legs spread apart while Henri had his right hand under the blanket between her legs in the crotch moving up and down.

Indicted for violation of 17 M.R.S.A., § 1951,[2] the defendant was found guilty as charged in a jury-waived trial. Sentenced to the Maine State Prison for a term of not less than three years and not more than six years, he appeals to the Law Court from said conviction and sentence. We hold that the conviction must stand, but the appeal must be sustained for error in the sentencing process and the case remanded for resentence.

---

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. 17 M.R.S.A., § 1951 provided in pertinent part:

"Whoever, having attained his 20th birthday, takes any indecent liberty or liberties or indulges in any indecent or immoral practice or practices with the sexual parts or organs of any other person, male or female, who has not attained his or her 16th birthday, either with or without the consent of such male or female person, . . . shall, upon conviction thereof, be punished by imprisonment at hard labor for not less than one year nor more than 10 years." (See P.L.1969, c. 433, § 21). This statute was repealed by Public Laws, 1975, c. 499, § 10 and replaced by 17-A, §§ 251, 255, effective May 1, 1976.

*Sufficiency of the evidence*

The defendant's conviction rests ultimately upon the victim's testimony that "[h]e [meaning the defendant Samson] put his hands on my pants." (Underscoring ours). In *State v. Rand*, 156 Me. 81, 161 A.2d 852 (1960), where the defendant was under indictment for criminal assault and battery and the evidence was that the defendant had put his hands on the outside of her clothing on her private parts, this Court said in dictum:

> "Although the acts proven *may not* constitute an offense under the indecent liberties statute . . . it does not follow that they do not constitute an assault and battery." (Emphasis added)

This dictum has been viewed as the law of Maine by the drafters of our recent Maine Criminal Code. See 1977 Pamphlet, relating to Title 17–A, at pages 74 and 80. Notwithstandingly, it is our present duty to declare, whether under 17 M.R.S.A., § 1951 (as the statute appeared at the time of this alleged offense) the crime of indecent liberties was consummated by the touching of the young female's sexual parts or organs from the outside of her clothing, or was it necessary to constitute a violation of the Act that there must be a skin to skin contact?

In *Miles v. State*, 157 Tex.Cr.R. 188, 247 S.W.2d 898 (1952), the Texas Court noticed that the statute involved, like our own, broadly denounced the placing of a hand upon or against the sexual part of a male or female under the age of fourteen (14) years and that nothing in the statute suggested that the crime could be committed *only* by the application of the bare hand of the accused to the bare or naked sexual part of the child. That Court concluded it could not, under the guise of statutory construction, write into the statute a limitation not contained therein.

**3.** The Maine Criminal Code, as enacted by the Legislature, effective May 1, 1976, specifically prohibits the taking of indecent liberties within the context of the facts of the instant case. 17–A M.R.S.A., § 251 defines the unlawful sexual contact prohibited in section 255 in the following terms:

In *State v. Reich*, 186 Neb. 289, 183 N.W.2d 223 (1971), cert. denied, 404 U.S. 846, 92 S.Ct. 149, 30 L.Ed.2d 83, the Nebraska Court, in dealing with an analogous statute, reached the same conclusion, expressing its supporting rationale in manner as follows:

> "The defendant asks us to read into the statute a meaning and a requirement that the massaging and the fondling referred to in the statute requires that it be on the naked body of the victim of the offense. While penal statutes must be construed strictly, it is not proper to give them a strained or an unnatural construction. They should be construed so as to give effect to the plain meaning of the words employed, and where of doubtful meaning, or application, the court should adopt the sense that best harmonizes with the context and the apparent policy and objects of the Legislature, [citation omitted]. It is apparent that the statute was not intended to protect only unclothed small girls or permit the accomplishment of the act[s] sought to be prohibited by the statute as long as they were performed on a clothed girl victim."

We agree. We cannot believe that our Legislators intended that a piece of clothing, as flimsy and truth-revealing as a female's panties in the instant case, would insulate a child molester from the reach of our indecent liberties statute. The legislative intent was to protect children against the perpetration of sexual indignities to their person in a manner abhorrent to society and to save them from being subjected to iniquitous conduct having a tendency to produce serious emotional and psychological impact on such minors who, because of their tender age, are deemed incapable of protecting themselves. The statutory purpose would be frustrated to a very substantial degree if the only prohibited indecent contact had to be of the flesh-to-flesh variety.[3]

D. " 'Sexual contact' means any touching of the genitals, directly or through clothing, other than as would constitute a sexual act, for the purpose of arousing or gratifying sexual desire."

To the same effect, see *People v. Keesee,* 47 Ill.App.3d 637, 7 Ill.Dec. 768, 365 N.E.2d 53, 57 (1977); *State v. Kocher,* 112 Mont. 511, 119 P.2d 35 (1941); *People v. Halistik,* 69 Cal.App. 174, 230 P. 972 (1924).

We conclude that the defendant's motion for acquittal was properly denied.

### Competency of the child witness

The defendant claims on appeal that Mary Ann's testimony was inadmissible, because, so he argues, "she was unable to clearly establish by any positive examples that she understood the difference between right and wrong *except in response to the leading questions of the attorney for the State."* (Emphasis supplied). No error was committed by the presiding Justice in receiving Mary Ann's testimony over the defendant's objections.

■ Initially, let us say that there was no impropriety in allowing the prosecutor on voir dire to ask leading questions to the 10-year old prosecutrix. In a prosecution for taking indecent liberties with the sexual organs of such a minor female prosecutrix, the action of the presiding Justice in permitting counsel for the State, in preliminary examination to determine competency, to address leading questions to the 10-year old child was within the Court's sound discretion and no abuse of discretion has been shown. See *State v. Bennett,* 158 Me. 109, 179 A.2d 812 (1962); *State v. Bragg,* 141 Me. 157, 40 A.2d 1 (1944).

■ In regard to the issue of competency, the rule has been laid down in previous cases of this Court. A child's competency to testify depends on a showing to the satisfaction of the trial justice that the proposed child witness is sufficiently mature (1) to understand questions and narrate answers intelligently, (2) to receive accurate impressions of facts by his senses, be able to recollect them correctly and have the capacity to relate a true version of the impressions received, (3) to have some understanding of the difference between truth and falsehood. *State v. Hodgkins,*

Me., 238 A.2d 41 (1968); *State v. Ranger,* 149 Me. 52, 98 A.2d 652 (1953). In relation to the child's comprehension of the truth and falsehood concepts, a young child's testimonial competency may be said to be sufficient, if the child appears to have capacity to understand, in some measure, the obligation of an oath or, in practical conception, the capacity to realize that it is wrong to falsify and that if he does tell an untruth he is likely to be punished. *State v. Ranger,* supra; *State v. Brewer,* Me., 325 A.2d 26, 27 (1974).

■ The question of competency of a child to testify is addressed to the discretion of the presiding justice. *State v. Hodgkins,* supra; *State v. Beckwith,* 158 Me. 174, 180 A.2d 605 (1962). In the instant case, the record fully supports the presiding Justice's determination that Mary Ann was competent to testify, notwithstanding that she could not volunteer specific examples of "something right" and "something wrong" and answered generally that she did not know the difference between good and evil beyond her articulation that "[r]ight means you do something right, and wrong means if you do something wrong, you did it wrong." From the totality of the voir dire examination, we cannot say that there was an abuse of discretion in adjudicating the ten-year old witness competent to testify.

### Testimonial evidence of prior conviction

On direct examination of the defendant's younger brother, Joseph R. Samson, the defendant's counsel asked the witness: "Do you know what Mr. Samson's reputation for truth and veracity is in the community?" To this inquiry the younger Samson replied: "Well, he has always been truthful with me. As far as I know, he is a good worker. He may have his faults, but molesting young girls, I don't believe, is one of them." Although this evidence was unresponsive and more in the nature of a character reference rather than evidence of the witness' brother's reputation in the community for truth and veracity, the State did not object, nor

did it move to strike. Instead, the prosecutor, on cross-examination, sought from the witness an amplification of the faults which the witness said his brother had. The following colloquy took place:

"Q. . . . What kind of faults does he have?

"A. Oh, he's a rascal, just like anyone.

"Q. Well, a rascal includes a great deal. Is there anything specific you can give me in relation to his rascality?

"A. Oh, he's a joker; he may take a few drinks.

"Q. Are you aware of anything that would blemish his reputation in the community?

"A. No.

"Q. You know of nothing that your brother has ever done that could blemish his reputation?

"A. Other than his past record once upon a time, which I don't hold that against any man.

"Q. Your brother has a record?

"A. Yes, he does.

"Q. What kind of a record?"

The defendant's objection at this point was overruled, and the witness disclosed his brother's previous record of a conviction of manslaughter. The presiding Justice stated for the record that the evidence was being received, not as substantive evidence to prove the truth of this testimonial information, but solely to show the younger brother's knowledge of the defendant and to affect the younger brother's credibility as a witness.

■ In this, there was no error. The witness had vouched, on direct examination, for the defendant's character of being a truthful person. Even though such evidence was unresponsive and incompetent in the form presented and could have been stricken upon motion of the State, when it remained in the record by consent, it became subject to contradictory exploration as any other evidence in the case. *State v. Ernst,* 150 Me. 449, 114 A.2d 369 (1955), where rebuttal testimony of a State witness was deemed properly allowed to show the tone of voice of a defense witness to contra-

dict her previous testimony that she was "very calm, cool, and collected." See also *United States v. Jewett,* 520 F.2d 581, 584 (1st Cir. 1975); *State v. Armstrong,* Me., 344 A.2d 42 (1975); *State v. Gervais,* Me., 317 A.2d 796, 803 (1974).

■ Furthermore, when the presiding Justice limited the purpose for which he would consider this evidence to impeachment of the younger brother's credibility, such as regards the witness' opinion that molesting young girls was not one of the defendant's faults, no prejudice resulted to the defendant.

■ Moreover, the scope of cross-examination is a matter for the discretion of the trial court and the question for our determination as a reviewing court is to see whether or not there was an abuse of discretion. *State v. Ryder,* Me., 348 A.2d 1, 4 (1975); *State v. Gervais,* supra. There was no abuse of discretion on the part of the presiding Justice.

### Community poll on sentence

Prior to sentencing the defendant, the Court ordered a presentence investigation by the State Board of Probation and Parole. Following the Justice's request to the Probation and Parole Officer to ascertain the attitude towards the defendant of residents of Livermore Falls, where the defendant was then living, and what they thought should be the proper sentence in the instant case, twelve of over three thousand inhabitants of the town were interviewed. The questionnaire conducted by the officer was stated to be in the following general format:

"I said to the people that a man by the name of Henri Samson who lives in Livermore Falls has been convicted of having indecent liberties with a ten-year old girl. He is now before the Court to be sentenced, and on instructions of the Presiding Justice I have been asked to come to Livermore Falls and find out how the community feels about what should happen to this fellow. I . . . explained, if they didn't know, what inde-

cent liberties meant, and said that the range of sentence, according to statute, was one to ten years, that the Judge had an option to give him less than that, but, if you were in the Judge's shoes, what would you recommend?"

Objections to the report were overruled by the presiding Justice who said that

"[i]t does seem to me to be significant to know in general what the attitude is for the particular type of offense, and in general what the attitude may be for a defendant."

The defendant appeals from this ruling and we sustain his appeal in respect thereto and do remand the case to the Superior Court for resentencing.

## A.  *Reviewability on Direct Appeal*

The State argues, preliminarily, that error in the sentencing process is not cognizable on direct appeal to the Law Court, but must be addressed to the Appellate Division of the Supreme Judicial Court pursuant to 15 M.R.S.A., §§ 2141–2144. We disagree.

In *State v. Carver,* Me., 330 A.2d 785 (1975), we approved Professor Glassman's comment respecting the interplay between 15 M.R.S.A., §§ 2141–2144 and 4 M.R.S.A., § 57 (the statutory charter of the Supreme Judicial Court sitting as the Law Court):

" 'The appellate review of sentence provided for by the new statute should be carefully distinguished from an ordinary appeal. In an appeal to the Supreme Judicial Court sitting as the Law Court [footnote omitted], the Court does not and may not review the sentence *except to the extent that there may be involved in the appeal a claim that an illegal sentence was imposed.* On the other hand, an appeal to the appellate division of the Supreme Judicial Court, pursuant to the new statute, to seek review of the sentence does not permit the appellate division to consider any alleged errors in the proceedings; *the sole issue which the appellate division may consider is the propriety of the sentence imposed.'* " (Emphasis added). Glassman, Maine Practice, Rules of Criminal Procedure, Commentary 40.1.

Illegality in the sentencing process rendering the sentence imposed illegal may be raised on direct appeal. *State v. Capitan,* Me., 363 A.2d 221 (1976).

## B.  *Merits of Issue*

The present issue is, whether it was reversible error for the Court below to receive the report of a poll of the community in which the convicted felon resided at the time the survey was made, which poll, as ordered by the Court and as conducted by the probation-parole officer, indicated the recommendations of each person interviewed respecting the particular sentence he or she recommended as punishment to be meted out to the defendant, who, as they had been made aware, had been convicted of the crime of taking indecent liberties with the sexual parts of a young female child. We hold that the use of such polls, whether conducted as in the instant case in a selective and restrictive style without any effort to reach a cross-section of the inhabitants of the community or taken on a more sophisticated basis as in the manner the well-known Gallup and Harris polls are run, is impermissible as carrying within themselves an inherent potential of coercive influence upon the sentencing judge. Such a procedure would subject a defendant to the prejudicial whims of the populace, with no realistic opportunity to challenge the bias of the information obtained. *People v. Sumner,* 40 Ill.App.3d 832, 354 N.E.2d 18, 24 (1976). If such *methodology were* sanctioned in the criminal sentencing process, trial judges could effectively shun their personal responsibility in meting out punishment to convicted individuals, reverting, as it were, to procedures which gained overwhelming popularity during the French Revolution.

Paraphrasing what we said in *State v. Capitan,* supra, at page 225, we emphasize again that specific sentencing recommendations, particularly if attended by publicity, and especially when coming from "the people," are bound to put the sentencing authority under unwarranted and unfair pressures.

We recognize that a heavy responsibility is entrusted to the trial judge, who must pass a value judgment upon a human being. In this, he represents the society at large. His task is rendered more difficult by reason of the fact that imperative standards, scientific or philosophical, do not exist to fix a particular punishment in a particular case. The Legislature, except in the case of mandatory sentences, has delegated the propriety of the particular sentence in a particular case to the sound discretion of the sentencing judge.

■■■ There is undoubtedly a strong public interest in the imposition of a proper sentence and a court has a wide latitude of inquiry, when seeking adequate information to enable it to make an informed judgment respecting sentence. That judgment must be tailored to the individual case with the rights of the public duly protected at the same time.

In order to help the court in meeting this problem, the Legislature has provided the investigatory services of a probation-parole officer for the purpose of furnishing the court with such pre-sentence information as will permit it properly to discharge its duty of administering a just punishment.[4] Since the statute failed to delineate the specific information which the probation-parole officer should present to the court in connection with the sentencing process, the Supreme Judicial Court implemented the statute by promulgating Rule 32, M.R.Crim.P., which requires in pertinent part as follows:

"(c) *Pre-Sentence Investigation.*

(1) *When Made.* The court may in its discretion direct the State Board of Probation and Parole to make a pre-sentence investigation and report to the court before the imposition of sentence or the granting of probation. * * *.

(2) *Report.* The report of the pre-sentence investigation shall contain any prior criminal record of the defendant and such information on his characteristics, his fi-

nancial condition, and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant, *and such other information as may be required by the court.* * * * ." (Emphasis additional)

■■■ We agree that a sentencing judge may exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by law, provided the settled course of procedure contemplated by Rule 32, M.R. Crim.P. be complied with. See *Green v. State*, Me., 247 A.2d 117 (1968).

As stated in *United States v. Harris*, 558 F.2d 366 (7th Cir. 1977), "[i]n determining an appropriate punishment, all the circumstances of the particular crime and the background of the individual offender must be considered. [footnote omitted] This individualized sentencing process requires 'possession of the fullest information possible concerning the defendant's life and characteristics,'" citing *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

Although Rule 32(c), M.R.Crim.P., does not purport to be exclusive, since it provides, in the catch-all clause, the furnishing of such other information as may be required by the court, nevertheless, from the nature of the specific information it does prescribe, we conclude that the main objective of the judicial policy underlying the rule is to secure to the sentencing court an individualistic picture of the person to be sentenced with emphasis on circumstances about the person or in his personal background as may have an impact on his behavior.

■■■ It is generally recognized that a trial court in imposing sentence should take into consideration the following factors: the gravity of the offense, its relation to

---

4. 34 M.R.S.A., § 1502. "The general powers and duties of a probation-parole officer are:

    *    *    *    *    *    *

2. *Investigation.* To investigate any criminal case or matter concerning probation or parole referred to him for investigation and report the result of his investigation; . . . ."

the victim of the crime, if any, and the defendant's degree of culpability therein; the defendant's background, including his past record of criminal offenses and any history of undesirable behavior pattern; the defendant's personal characteristics, such as his personality, character and social traits, his age, educational background and employment record, his remorse, repentance and cooperativeness; the defendant's subjectivity to rehabilitation; the interest of the public in retribution and deterrence, and its right to protection against crime. There undoubtedly might be other factors germane to the task facing the sentencing court in assessing a just sentence, which at the same time should be the judgment of the judge and an adjudication tailored to the individual characteristics and deserts of the particular defendant, viewed in the light of the public interest in law and order.

A poll of the members of the public for the purpose of obtaining sentence recommendations such as was conducted and reported in this case should not be used as a factor by the trial court in passing sentence, as in our view such procedure would be contrary to a sound judicial policy, would not be in the best interest of society and is outside the scope of Rule 32(c).

Even though retribution, deterrence and protection of the public against crime and disorder are legitimate considerations to be taken into account in arriving at a just sentence in any particular case, such basic motivations should not be implemented by the sentencing justice in an atmosphere charged with personal spites, sectional prejudices and public likes or dislikes which polls are likely to produce.

The instant poll demonstrates beyond a doubt the tremendous pressure which such procedural mechanism, if allowed, could bring to the sentencing process. Indeed, the recorded interviews of the twelve individuals, all of the more affluent social class in Livermore Falls except for the mother of the victim and the defendant's lady friend, as reported to the court by the probation-parole officer, produced strictly personal recommendations respecting the sentence to be imposed in the defendant's case, notwithstanding their apparent complete unacquaintance with Henri C. Samson, Sr. These recommendations ranged from the maximum sentence of imprisonment to a term of not less than five years and not more than ten years to such other biased exhortations as:

"A guy like that don't belong in the community;"

"I would throw the book at him;"

"If I were the Judge I would hang him by the balls of his feet in the middle of the park."

We appreciate that the presiding Justice did say for the record that the court had no intention of relying upon a public opinion poll to determine the sentence to be imposed. But he also added for the record that it did seem to him to be significant to know in general what the attitude was for the particular type of offense. He thought, so he stated, the defendant's objection was a matter going to the weight to be given the overall report rather than its propriety.

From the sentencing Justice's remarks for the record, it is not unreasonable to conclude that, in passing the sentence he did impose, he may well have been influenced, albeit unconsciously, by improper factors introduced as a result of the poll report. Any doubt in this regard must be resolved in favor of the defendant. See *United States v. Harris,* supra; *State v. Nichols,* 247 N.W.2d 249 (Iowa 1976).

The entry will be

Affirmed in part.

Judgment of conviction affirmed.

Sustained in part.

Sentence below vacated.

Case remanded for resentencing by a Justice other than the Justice who imposed the original sentence.

WEATHERBEE, J., sat at oral argument and participated in consultation, but died prior to the preparation of the opinion.

DELAHANTY, J., did not sit.