STATE of Maine

v.

Albert C. BLANCHARD.

Supreme Judicial Court of Maine.

Dec. 20, 1979.

Guy P. Seaberg, Asst. Atty. Gen. (orally), Augusta, for plaintiff.

Fellows, Kee & Nesbitt, by Samuel Nesbitt, Jr. (orally), Bucksport, John Evans Harrington, Bangor, for defendant.

Before POMEROY, WERNICK and GLASSMAN, JJ., and DUFRESNE, A. R. J.

WERNICK, Justice.

On June 6, 1978 an indictment was returned in the Superior Court (Penobscot County) charging defendant Albert C. Blanchard with two counts of theft by unauthorized taking (17–A M.R.S.A. § 353) and three counts of embezzlement (17 M.R.S.A. § 2109). About one year later, on May 4, 1979, defendant appeared in court to retract pleas of "not guilty" previously entered to those five counts and to waive Indictment and consent to the filing of an Information charging him with an additional seven counts of theft by unauthorized taking under 17–A M.R.S.A. § 353. The Information was filed and defendant tendered guilty pleas on all twelve counts. Thereafter, the proceedings were concerned with developing a record showing that defendant's guilty pleas were voluntarily and intelligently made, and with the sentencing of defendant.

Prior to pleading guilty defendant had negotiated an agreement with the State. The agreement was that the case would be appropriately disposed of on the following basis: (1) defendant would plead guilty to all twelve counts of the Information and resign from the bar; (2) defendant's sentence would be incarceration for two years and defendant should make full restitution to victims; (3) the State would not object to defendant's request for incarceration at an institution other than the Maine State Prison; (4) the State would not object to defendant's testifying about his present financial status, this being information necessary to a judicial determination whether restitution would be an appropriate punishment; and (5) the State would not oppose defendant's request for a three day stay of execution of sentence. All parties to the agreement understood, without question or reservation, that it remained subject to approval by the court before it could become effective as to its provisions for sentence.

The presiding Justice rejected the agreement. He gave defendant opportunity to withdraw his guilty pleas, but defendant refused to withdraw them. After a lengthy inquiry and discussion concerning the circumstances of the case, the Justice imposed sentences that defendant serve concurrent terms of imprisonment for five years and make full restitution of $55,697.46.

Defendant has appealed to this Court from the judgments of conviction. He raises points resting principally on a foundational contention that the sentences cannot be permitted to stand because of illegality in them arising from alleged defects in the "sentencing process."[1] Accord-

---

1. Defendant purports to include in his attack on the "sentencing process" a claim affecting his *conviction*: that his guilty pleas should be held invalid because of deficiencies in the Rule 11 inquiry. This issue cannot be given cognizance in this direct appeal. It does not fall within the exception mentioned in *Dow v. State*, Me., 275 A.2d 815, 820–21 (1971), defendant having made no motion, and having refused, to withdraw his guilty pleas as the necessary precondition to have the Rule 11 deficiencies decided in a direct appeal. We

ingly, defendant asks this Court to vacate the sentences imposed and to require that defendant be sentenced in accordance with the terms of the agreement he negotiated with the prosecutor.

More particularly, defendant's contentions are: (1) the presiding Justice committed error of law in rejecting the negotiated agreement; (2) the prosecutor acted in violation of the agreement he had made; (3) the presiding Justice's use of a presentence report constituted reliance on a "sentence poll"; (4) the presiding Justice failed to comply with statutory guidelines as to eligibility for probation and unconditional discharge when he imposed sentence; and (5) the presiding Justice failed to follow the procedures statutorily prescribed to make lawful a sentence ordering both that defendant be incarcerated and make restitution.

■ Before considering the foregoing issues, we take the precaution to emphasize one general principle that underlies our analysis of each of the issues. This principle is that even though illegality in a sentence may qualify for review in a direct appeal, as a "jurisdictional" infirmity, yet, because the review in a direct appeal is confined strictly to the record brought before the court, the claimed illegality of a sentence can be given ultimate cognizance on direct appeal only where the alleged sentencing infirmity appears so plainly on the face of the record that there can be no rational disagreement as to its existence. *State v. Rich*, Me., 395 A.2d 1123 (1978); *State v. Parker*, Me., 372 A.2d 570 (1977). *See also Dow v. State*, Me., 275 A.2d 815 (1971).

### 1.

Defendant contends that the Justice committed error of law in rejecting the plea agreement of the parties because: (1) the Justice failed to articulate on the record reasons for rejecting the plea agreement; (2) acceptance of a plea agreement is compulsory unless an abuse of prosecutorial discretion in formulating the agreement is established, and (3) the presiding Justice was biased and hostile to a degree that precluded a rational decision by him whether the plea agreement should be accepted.

■ Turning, first, to the last of these reasons, we find that the record does not plainly establish that the attitude of the presiding Justice toward the defendant was such as would preclude an objective, rational decision by him as to his acceptance or rejection of the negotiated agreement. Though the Justice made several comments about the effect that the defendant's conduct may have upon the legal profession as a whole and upon him (the Justice) personally as a member of that profession, the entirety of the record reveals that he was fair in his handling of the matter.

■ The remarks of the Justice relied upon by defendant to establish bias express not a personal hostility toward defendant but, rather, underscore what emerges as the principal factor indicating need that the sentence be severe: that defendant was in a position of trust as an attorney at law. According to his express statement, the presiding Justice was sensitive to the potentially negative impression that an attorney's misconduct generates in the public mind, and thus the Justice believed it important that defendant be given a punishment more severe than that provided for in the negotiated agreement. It is plainly within the discretionary authority of a sentencing Justice to take such a consideration into account.[2] *See United States v. Baer*, 575 F.2d 1295 (10th Cir. 1978).

■ The record fails to provide the support requisite to allow review on direct

therefore address defendant's contentions in this appeal only as they are directed to the legality of the sentences imposed on him. *See State v. Parker*, Me., 372 A.2d 570 (1977).

2. One of the express purposes of sentencing provided in the Code is to "permit sentences which do not diminish the gravity of offenses." 17–A M.R.S.A. § 1151(8). It is not unreasonable to punish more severely those who are entrusted with protecting another person's property and rights and who deliberately violate that trust for their own personal gain.

appeal of defendant's contention that the presiding Justice did not articulate affirmatively on the record the reasons for his rejection of the negotiated agreement. On several occasions the Justice indicated that the terms of the agreement were unsatisfactory in light of the seriousness of the charges. Before he actually rejected the agreement, the Justice several times stated to the defendant in rather strong terms that he was reluctant to accept defendant's guilty pleas. Immediately after rejecting the negotiated agreement, the Justice remarked:

"The nature of the profession would require the full penalty of the law . . on one convicted of this offense."

The record thus strongly indicates a fundamental, and pervasive, reason for the rejection of the plea agreement: the Justice's belief that defendant's position of trust as an attorney and the nature of the offenses perpetrated warranted more severe punishment than two years' imprisonment and payment of restitution. That the sentence agreed upon as a part of a plea bargain is too lenient is plainly a legitimate consideration for rejecting the negotiated agreement. *United States v. Bean,* 564 F.2d 700 (5th Cir. 1977).

■ Apart from whether the remarks in question constituted an articulation on the record of the Justice's reasons for rejection of the negotiated agreement, the law does not require that the sentencing Justice express on the record the reasons for rejection. Rule 11(b)(2) M.R.Crim.P.[3] mandates only that the court require disclosure on the record of the terms of a negotiated agreement, and then vests the court with plenary authority to accept or reject the plea (or defer its decision thereon). Rule 11(b)3 requires that

"the court shall on the record inform the parties of this fact, advise the defendant personally in open court that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw his plea and advise the defendant that if he does not withdraw his guilty plea or plea of nolo contendere the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement."

Nowhere in Rule 11 is there a stated requirement that the court set forth on the record its reasons for rejecting a negotiated agreement. In light of the express and extensive procedural requirements that Rule 11 does impose, it should not be interpreted to include, by implication, additional requirements not really essential to effectuate its spirit. *See State v. Doucette,* Me., 398 A.2d 36 (1978); *see also United States v. Bean,* 564 F.2d 700 (5th Cir. 1977).

■ We reject defendant's last argument on the issue now under discussion: that the court's discretion to reject negotiated agreements must be held limited to instances where the prosecutor is guilty of an abuse of discretion in becoming party to a particular agreement. Under Rule 11(b)(2) the court has plenary, if not utterly unfettered, discretion to decide whether to accept or reject a negotiated agreement. Similarly, it has been held that, in general, a court's discretion to reject a negotiated agreement, on the ground that the court will not accept its provisions for sentence, is as broad in scope as the discretion reposed in the court to impose sentence. *United States v. Bean, supra.*

The case of *United States v. Ammidown,* 162 U.S.App.D.C. 28, 497 F.2d 615 (D.C. Cir. 1973), cited by defendant, is distinguishable in a most critical respect from the instant situation. In *Ammidown* the Justice rejected the negotiated agreement because he disagreed with the *charges* brought by the prosecutor, *not* because he was unwilling to accept the *sentence disposition* set forth in the agreement. Indeed, the Court of Appeals in *Ammidown* expressly acknowl-

---

3. Rule 11(b)(2) M.R.Crim.P. provides:

"(2) Notice of Such Agreement. If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court at the time the plea is offered. Thereupon the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report."

edged the importance of this point, that the sentencing court had not exercised a discretion properly reposed in it but had encroached upon the discretion that belongs to the prosecutor.

## 2.

We turn to defendant's second basic contention, that the prosecutor violated the plea agreement in two respects: (1) he failed to inform the court of the "bases" of the plea agreement, and (2) he reneged on his promise not to object to defendant's request for incarceration at a specific institution.

█ As to the latter claim, defendant states that a comment made by the prosecutor to the Justice during the May 4, 1979 proceeding was a breach of the prosecutor's agreement not to object to defendant's request to be incarcerated at an institution other than the Maine State Prison.[4] After a lengthy statement by defendant's father, who urged the presiding Justice not to sentence defendant to the Maine State Prison, the prosecutor made the following comment, apparently intending to counterbalance the considerations introduced by the defendant's father:

> "Just a couple of remarks. In view of what the Court indicated would be a likely disposition . . . , I would say only faced with rejection of the plea agreement, the State's position would be the severity of the crimes charged here would warrant a substantial incarceration. I would waive any further argument in view of your Honor's remarks as far as aggravation, as far as place of service . . . [are] concerned. Mr. Harrington has correctly asserted the State has registered no objections to their request that the Court make any recommendations and as far as service at Thomaston I want the record clear on that point."

This statement by the prosecutor does not provide the plain support for defendant's contention requisite to allow a sentence to be held illegal in a direct appeal. The prosecutor carefully qualified his comment by noting that the State was not thereby objecting to the defendant's request as to the place of incarceration. Furthermore, the record shows that this comment was offered *after* the presiding Justice had definitively rejected the tendered agreement, and, therefore, the prosecutor's duties to comply with its terms had terminated.

Even if scrutinized strictly within its own confines, the prosecutor's statement does not violate his obligation under the negotiated agreement. The prosecutor promised not to object to such place as defendant would request for incarceration; he did not promise to refrain from expressing comments about the nature of defendant's offenses.

*United States v. Miller*, 565 F.2d 1273 (3rd Cir. 1977) supports our analysis in this regard. In *Miller*, the prosecution promised as part of the negotiated agreement to make no recommendation as to the terms of sentence. At the sentencing hearing, after defense counsel attempted to persuade the judge that a lenient sentence was appropriate, the prosecutor offered several observations about defendant's failure to cooperate and his general character, as a rebuttal of defense counsel's remarks. The Court of Appeals held that such rebuttal by the prosecutor was not a violation of the negotiated agreement; the prosecution promised not to make a sentence recommendation, in contradistinction to promising to "take no position." *See also United States v. Crusco*, 536 F.2d 21 (3rd Cir. 1976).

█ The other respect in which defendant claims that the prosecutor violated the negotiated agreement is that the prosecutor failed to inform the court of the "bases" underlying the formulation of the agreement. In accordance with the agreement, the prosecutor did fully inform the court of the details of the agreement, and the substance of the case against defendant (reciting the charges and summarizing the evidence to substantiate the charges).

---

4. Defendant feared reprisals from inmates incarcerated as a result of prosecutions he had conducted in Penobscot County.

█

Defendant believes, apparently, that the law should require the prosecutor to do more, namely, to spell out the particular motivations that prompted the State and the defendant to arrive at the terms of the agreement. We disagree. While such an inquiry might be relevant to the ascertainment of the voluntariness of a guilty plea, that is not the issue now before us. We note, too, that the principal case upon which defendant relies in advancing this theory, *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), imposes no such requirement. Beyond demanding that the prosecutor comply with any promises contained in the plea agreement, *Santobello* imposes, as a generalized legal duty of the prosecutor, only that the prosecutor shall disclose to the court the terms of the negotiated agreement and the factual basis for the charges against defendant.

*3.*

■ Defendant maintains that the "Community Sentiment" section of the Presentence Investigation Report was a "sentence poll" similar to that conducted in *State v. Samson*, Me., 388 A.2d 60 (1978), and, therefore, the presiding Justice's use of that information rendered the sentences illegal.

Because the record does not plainly indicate that the pre-sentence report used by the Justice in this case constituted a "sentence poll", in the sense that that phrase is used in *Samson*, the issue is not cognizable in this direct appeal.

Before announcing his decision to reject the negotiated agreement, the presiding Justice consulted a presentence report which had been prepared in usual course by a probation officer submitted to the Justice under the authority of Rule 32(c) M.R. Crim.P. The report contained information concerning defendant's personal, family, educational, and employment history as well as a psychological profile and a "Community Sentiment" section. In the "Community Sentiment" section nine members of the defendant's community had submitted statements about their relationship with, and impressions, of defendant and also their opinions of the conduct for which defendant had been arrested. Five persons made general comments about the degree of punishment that would be appropriate. The Justice read the report immediately before rejecting the agreement, and expressly mentioned the views (both favorable and unfavorable) stated in the report.

The report in the instant case is distinguishable from that prepared in *State v. Samson*, Me., 388 A.2d 60 (1978). In *Samson*, the trial Justice personally ordered that a poll of the community be conducted to "find out how the community feels about what should happen to this fellow." 388 A.2d at 65. The *Samson* report focused narrowly and exclusively upon the appropriate sentence deserved by defendant. As the *Samson* Court noted, polls of the community's specific attitude undertaken at the request of the trial Justice for the express purpose of guiding his sentencing decision may bring to bear upon the sentencing process "tremendous pressure." Here, however, the presiding Justice did not specifically order that a poll of community sentiment be taken on the single question of appropriate sentence. Moreover, the report had been prepared prior to the proceeding, and the specific section of the report challenged did not focus exclusively upon the question of sentence disposition. This kind of sampling of community sentiment can be of benefit to a sentencing Justice, and it involves so minimal, if any, potential for exposing the Justice to the "tremendous pressure" frowned upon in *Samson* that *Samson* can have no precedential force in the case at bar.

*4.*

■ Defendant argues that 17–A M.R. S.A. § 1201,[5] which governs eligibility for

---

5. 17–A M.R.S.A. § 1201 provides:

"*1.* A person who has been convicted of any crime may be sentenced to a suspended term of imprisonment with probation or to a suspended fine with probation or to an unconditional discharge, unless:

"*A.* The conviction is for murder;

"*B.* The statute which the person is convicted of violating expressly provides that the

probation and unconditional discharge, requires a sentencing Justice to make specific findings of probation eligibility, enumerated in § 1201(1)(A–D), for *all* sentences, and that § 1201(2) then *requires* probation or unconditional discharge of those not falling within the stated exceptions in § 1201(1) or of those not specifically found to fall within the exceptions.

We reject this argument. Defendant's interpretation of § 1201 overlooks the word "may" in § 1201(1)—

> "[a] person who has been convicted of any crime *may* be sentenced to a suspended term of imprisonment . . . . ." (emphasis added)

The findings referred to by defendant are necessary only when a sentencing Justice determines that probation or discharge is appropriate; they are not required to be made for *every* sentence imposed. Any other interpretation would ignore the plain language of the particular statute as well as its relation to, and role in, the overall statutory scheme as to sentencing.

### 5.

[13] Finally, defendant challenges as illegal the restitution orders in the sentences on the grounds that the Justice failed to comply with the authorizing statutes, by: (1) ordering restitution without making a specific inquiry into the defendant's financial status and ability to pay as required in 17–A M.R.S.A. § 1325, and (2) failing to specify the time and method of payment as required in 17–A M.R.S.A. § 1326. The record, we conclude, leaves no basis for rational disagreement that the Justice failed to comply with the statutes authorizing restitution. We, therefore, in this direct appeal, take cognizance of this issue raised by defendant, and we decide that the parts of the sentence ordering defendant to make restitution are illegal because of the Justice's failure to comply with statutory requirements.

The Justice ordered restitution, totalling $55,697.46, as to ten of the twelve counts to which defendant pleaded guilty.[6] One of these counts charged defendant with embezzlement under 17 M.R.S.A. § 2109; the other nine counts charged theft by unauthorized taking under 17–A M.R.S.A. § 353.

We discuss, first, the restitution ordered on the embezzlement count. That count charged an offense committed prior to the enactment of the Criminal Code, when there was no statutory authority for imposition of a sentence for restitution together with incarceration.[7] Under the prior law, then, the restitution order was illegal.

Moreover, even if defendant is taken to have consented to being sentenced under the Code for the embezzlement, as provided for in 17–A M.R.S.A. § 1(2),[8] thus to bring

---

fine and imprisonment penalties it authorizes may not be suspended, in which case the convicted person shall be sentenced to the imprisonment and required to pay the fine authorized therein;

"C. The court finds that there is an undue risk that during the period of probation the convicted person would commit another crime; or

"D. The court finds that such a sentence would diminish the gravity of the crime for which he was convicted.

"2. A convicted person who is eligible for sentence under this chapter, as provided in subsection 1, shall be sentenced to probation if he is in need of the supervision, guidance, assistance or direction that probation can provide. If there is no such need, and no proper purpose would be served by imposing any condition or supervision on his release, he shall be sentenced to an unconditional discharge. A sentence of unconditional discharge is for all purposes a final judgment of conviction."

6. As to the other two of the twelve counts, defendant had already repaid the amounts due.

7. One statute, 34 M.S.R.A. § 1631, did authorize restitution in the special, and limited, circumstances where a defendant had been convicted, civil liability had been established or admitted for the damage caused, and the defendant had been placed on probation for a definite period during which the case had been continued for sentence.

8. 17–A M.R.S.A. § 1(2) provides:

"Prosecution for crimes repealed by this code, which are committed prior to the effective date shall be governed by the prior law which is continued in effect for that purpose

to bear the authority conferred on the court to require restitution, there is no change of result. The restitution order as to the embezzlement conviction would then be illegal on the same grounds that the order for restitution as to the nine convictions for theft by unauthorized taking, committed after the Criminal Code became effective, must be held illegal: that, as the discussion to follow explains, the presiding Justice failed to comply with the Code's requirements for ordering restitution.

Section 1152(2–A) of the Code authorizes restitution in addition to incarceration as follows:

"*2–A.* Every natural person convicted of a crime may be required to make restitution *as authorized by chapter 54.* Subject to the limitations of chapter 54, restitution may be imposed as a condition of probation or may be imposed in addition to a sentence authorized by chapter 51 or to a fine authorized by chapter 53." (emphasis added)

Chapter 54, among other things, sets forth a list of standards to guide the sentencing court in its determination of the appropriateness of ordering restitution. Though § 1323 provides that "[a]ny offender may be sentenced to make restitution", various other sections in Chapter 54 place limitations upon a sentencing court's *authority* to order such punishment. Section 1325(1)(C) requires that

"[i]n determining the amount of restitution authorized, the [court] . . . shall [consider] [t]he *financial ability of the offender to pay restitution.*"

A tandem provision in § 1325(2)(D) states that:

"Restitution *shall not be authorized* : .

". . .

"When the amount and method of payment of monetary restitution or the performance of service restitution will create an excessive financial hardship on the offender or dependent of the offender. In making this determination, all relevant factors shall be considered, including, but not limited to the following:

"*(1)* The number of the offender's dependents;

"*(2)* The usual living expenses of the offender and his dependents;

"*(3)* The special needs of the offender and his dependents, including necessary travel expense to and from work;

"*(4)* The offender's income and potential earning capacity; and

"*(5)* The offender's resources." (emphasis added)

As further assurance that the sentencing Justice will determine the defendant's ability to pay, § 1326 *requires* that the court specify the time and method of payment.[9]

Thus, it is a precondition of the court's authority to require restitution that the court make a determination not merely of the particular amount to be paid but also of the method by which payment is to be made, thereby to delineate that the restitution to be ordered is financially tolerable for the offender. Accordingly, after appropriate inquiry, the sentencing Justice must arrive at a conclusion as to the defendant's ability to pay; absent such a determination, the Justice lacks authority to include an order for restitution in the sentence.

The legislative expression of purpose found in § 1321 adds support to this interpretation of the jointly operative effect of §§ 1325 and 1326. The Legislature recognized that restitution can serve rehabilatative ends in "certain instances", and that restitution is "ancillary to the central objec-

as if this code were not in force; provided that in any such prosecution the court may, with the consent of the defendant, impose sentence under the provisions of the code."

9. 17–A M.R.S.A. § 1326 provides:

"When restitution is authorized, the time and method of payment or of the performance of the services shall be specified. Monetary compensation which is not to be paid in in-

stallments or at a later specified time shall be paid to the clerk of the court having jurisdiction over the offender. In those cases, the clerk shall make the disbursement to the victim or other authorized claimant. All other payments and disbursements shall be made by the appropriate governmental agency or institution having jurisdiction or custody of the offender."

tives of the criminal law." Expressly discouraged, too, is the use of restitution solely because the defendant possesses "substantial financial resources." Thus, restitution is authorized in circumstances where it will further the objectives of the criminal law, not contravene them. When, as here, the defendant is presently indigent and will endure a long period of incarceration depriving him of the means to earn the income necessary for restitution, to require restitution serves neither the penological purpose of assisting in the rehabilitation of the offender nor the social objective of making the victim adequately whole.[10]

The record plainly reveals, here, that although the presiding Justice conducted an inquiry to determine defendant's ability to pay restitution, that inquiry demonstrated defendant's present inability to make restitution as well as the high probability that defendant would long be unable to pay restitution because of the five years of incarceration and the disbarment he was to suffer.[11] That these critical circumstances were not adequately taken into account is indicated by the failure of the presiding Justice to specify the time and method for payment of restitution as required by § 1326, despite the request for such a specification by defendant's attorney.

■ The restitution orders in the sentences must, therefore, be stricken as illegal. In addition, we conclude that the cases need not be remanded to the Superior Court for further evaluation of whether the sentences imposed on defendant may properly include an order for restitution. Since the record plainly establishes that defendant lacks the resources to pay restitution, and for a long time in the future cannot be expected to have such resources, we can finally dispose of the cases by modifying the judgments of conviction to conform to the plain showing of the record that restitution is not authorized because it "will create an excessive financial hardship on the offender . . . ." We strike from the portion of each judgment of conviction containing the sentence imposed on defendant the order requiring defendant to make restitution. We affirm the judgments of conviction as thus modified.

*The entry is:*

Appeals denied.

Judgments of conviction modified by striking from the sentences imposed on defendant any and all orders that defendant make restitution.

As thus modified, judgments of conviction affirmed.

Cases remanded to the Superior Court for entry of the modified judgments of conviction herein affirmed.

McKUSICK, C. J., and ARCHIBALD, GODFREY and NICHOLS, JJ., did not sit.

---

**10.** Of course, those who were injured by defendant's acts can bring civil actions against him to recover judgments for their damages and those judgments may be enforced against whatever assets defendant may subsequently acquire.

**11.** Twice during the May 4, 1979 proceeding the presiding Justice inquired into or received oral information concerning the defendant's financial status, in consequence of which the Justice became fully aware that defendant was unable to make restitution.

The only other mention of defendant's ability to pay restitution occurred after the presiding Justice rejected the proffered plea agreement.

Defendant himself expressed an intent to make restitution payments "to . . . the absolute best of my ability at such time I am able to get through the period of incarceration and start some type of new life." After that statement, defendant's attorney reiterated that the defendant was presently unable to pay restitution. No other information of the defendant's financial condition was supplied to the Justice at the hearing, except the pertinent section of the presentence report, which stated that "Mr. Blanchard states that at the present time he is broke, has no assets whatsoever." He further states that his liabilities are increasing every day.